UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
SOCIALRYSE LLC. (d/b/a SocialRyse Music Disco),

                       Plaintiff,                      COMPLAINT

         -against –                      Civil Action No. 25-cv-10337-LAK

YOUTUBE LLC and GOOGLE LLC.,         [Jury Trial Demanded]

                    Defendants.
-------------------------------------------------------------------X

## PRELIMINARY STATEMENT

1.    This action arises from Defendants YouTube LLC and Google LLC's (collectively, "YouTube" or "Defendants") wrongful, anticompetitive, and fraudulent campaign to destroy a legitimate, New York-based independent music label. After YouTube's —automated Content ID system generated and allocated over $600,000 in royalties to Plaintiff SocialRyse LLC ("SocialRyse") between September 2020 and January 2021---an acknowledgment of the legitimacy of its 100% owned music catalog — YouTube orchestrated the coercive termination of SocialRyse's distribution agreements. This was accomplished through Defendants' sudden invocation and retroactive application of a previously undisclosed 'Circumventing Content ID' enforcement rationale, which had never before been communicated to Plaintiff or publicly articulated. Upon information and belief, this enforcement escalation coincided with pressure from larger platform partners and operated to eliminate a rapidly growing independent competitor from the monetization marketplace. YouTube then fraudulently concealed its central role for years, falsely blaming SocialRyse's distributors. The interference annihilated SocialRyse's business, destroying an enterprise capable of generating in excess of hundreds of millions of dollars in

revenue over its natural commercial life, and continues to this day through covert, permanent "invalid reference" flags that prevent any reinstatement.

## PARTIES

2.    Plaintiff SocialRyse LLC is a New York limited liability company with its principal place of business in Brooklyn, New York, doing business as SocialRyse Music Disco ("SRMD"). Its sole member is Ralph Cohen, a citizen of New York.

3.    Defendant YouTube LLC is a Delaware limited liability company with its principal place of business in San Bruno, California, and is a wholly owned subsidiary of Google LLC. Upon information and belief, all its members are citizens of states other than New York.

4.    Defendant Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California. Upon information and belief, all its members are citizens of states other than New York.

## JURISDICTION AND VENUE

5.    This Court has diversity jurisdiction under 28 U.S.C. § 1332. There is complete diversity of citizenship between Plaintiff (New York) and Defendants (California/Delaware), and the amount in controversy far exceeds $75,000.

6.    This Court has federal question jurisdiction under 28 U.S.C. § 1331 for claims arising under the Sherman Act, 15 U.S.C. § 2.

7.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred here, Plaintiff resides and suffered injury here, and Defendants transact substantial business here.

## FACTUAL ALLEGATIONS

8.      SocialRyse, founded in 2018 as a digital marketing agency, expanded into creating and owning 100% of an original music catalog, which it promoted to YouTube creators. (Exhibit P).

9.      SocialRyse lawfully enrolled its catalog in YouTube's automated Content ID system through authorized distributors like AdRev and Create Music Group ("CMG"). Content ID automatically detects copyrighted audio in user videos and allocates proportional advertising and subscription revenue to rights holders.

10.     Plaintiff engaged in lawful marketing of its catalog of original music to the YouTube creator community as part of standard digital marketing practices in the music industry. Independent creators voluntarily chose whether to incorporate Plaintiff's tracks into their videos. Plaintiff did not control, direct, or pre-approve the non-music content of any third-party video. All detection, claims, monetization, and revenue allocation were administered exclusively through YouTube's automated Content ID system. (Exhibit M).

11.     In June 2020, when YouTube, via AdRev, inquired about this model, SocialRyse explained it transparently. AdRev subsequently confirmed YouTube had approved continued monetization, stating, "Yes! All good." (Exhibit A).

12.     On August 5, 2020, SocialRyse entered a Distribution Agreement with CMG (Exhibit B). The Agreement granted CMG the right to monetize SocialRyse's catalog via Content ID, with SocialRyse receiving 85% of net revenue. The Agreement had an initial one-year term with automatic annual renewals.

13.     Under this agreement, SocialRyse's revenue grew exponentially, generating over $600,000 in net royalties from YouTube between September 2020 and January 2021. (Exhibit F). Monthly revenue grew from $28,790 to $216,038---a compound monthly growth rate exceeding 60%. Songs like "Quarantine" and "Water" amassed tens of millions of views. (Exhibit K).

14.     Based on this demonstrated compounding growth and the automatic annual renewal structure of the CMG Agreement, SocialRyse reasonably anticipated that its YouTube royalties would continue to increase substantially over multiple years, generating substantial and recurring net revenue. Defendants' subsequent interference abruptly cut off this trajectory and destroyed a rapidly scaling business. (See Exhibit D, summarizing monthly revenue and growth rates.)

15.     Upon information and belief, in early 2021, major media rights holders (whose content often appeared in user videos alongside independent music) pressured YouTube to increase their revenue share by eliminating independent labels like SocialRyse from the Content ID ecosystem.

16.     Despite the fact that SocialRyse had no direct contract or Content ID relationship with YouTube, and despite SocialRyse's undisputed ownership of one hundred percent (100%) of the copyrights in the original sound recordings and musical compositions it distributed, YouTube nevertheless targeted SocialRyse's monetization operations through covert and coercive means. Rather than identifying any published rule violation, YouTube retroactively invoked a previously unpublished and undefined enforcement rationale, "Circumventing Content ID"---to justify interference with lawful monetization activity that had already been conducted openly, reviewed by distributors, and previously allowed to operate. This concealed reclassification was never disclosed to SocialRyse at the time and was used as a pretext to destabilize Plaintiff's distribution relationships without due process, warning, or contractual authority.

17.     Internal communications reveal that YouTube personnel exerted coercive pressure on Create Music Group ("CMG") to engage in mass removals of disfavored artists and labels. In a February 9, 2021, email, YouTube employee Ian Connelly explicitly directed CMG to conduct a "strong purge" of certain labels and artists. (Exhibit I). In related correspondence, YouTube further warned that CMG's CMS functionality could be "redacted" and that monetization claims could be

forced into a universal "pending" state unless CMG complied. (Exhibit I). These communications reflect YouTube's use of platform dominance and economic leverage to compel distributor action and dictate which rights-holders would be permitted to monetize.

18.    On or about April 14, 2021, YouTube's Trust & Safety personnel transmitted additional internal communications to CMG containing expanded directives to remove multiple artists' reference files in furtherance of the previously coerced "strong purge" campaign. (Exhibit I). These communications reflected the continuation and escalation of YouTube's coercive enforcement strategy and that CMG aggressively deactivate monetization assets under threat of CMS feature suppression.

19.    As a direct and intended consequence of YouTube's escalating coercion and threat-based leverage over CMG's CMS access, CMG terminated monetization of SocialRyse's catalog on or about March 1, 2021, citing YouTube's asserted "circumvention" concerns and related compliance pressures. (Exhibit J). Following CMG's termination, additional distributors---including RouteNote---implemented similar removals and refusals, invoking the same "circumvention" rationale. (Exhibit C). These cascading terminations occurred despite no contractual breach by SocialRyse and were economically irrational for the distributors absent external pressure, as SocialRyse's catalog was generating rapidly accelerating revenue at the time.

20.    On February 23-25, 2021, YouTube's Rights Management team, in response to SocialRyse's direct inquiry, stated that revenue-sharing arrangements with channels were "out of our scope" and "YouTube does not mediate on this anymore." (Exhibit G). This directly contradicted the "circumvention" rationale YouTube was using internally.

21.    Following the suspension of Plaintiff's monetization and during Plaintiff's good-faith investigation into the cause of its sudden business termination, Defendants affirmatively

misrepresented that the actions taken against Plaintiff's catalog were the independent decisions of third-party distributors and not the result of any centralized directive, coercion, or enforcement by YouTube itself. In July 2021, YouTube Partner Support representatives Edjun and Haze explicitly told SocialRyse, "YouTube is not able to suspend your assets" and "we did not suspend your music, and it was your label/distributor who decided to do so." (Exhibit H). These statements were knowingly false and misleading, as internal emails evidence YouTube coerced the suspension.

22.    Plaintiff reasonably relied on Defendants' repeated denials and misrepresentations that the distributors acted independently and that YouTube played no role in the enforcement or deactivation decisions. As a result of these misrepresentations and Defendants' concealment of their coercive campaign behind intermediaries, Plaintiff lacked any objective facts establishing YouTube's direct orchestration of the terminations for a substantial period. The enforcement label referenced to Plaintiff---"Circumventing Content ID"---was vague, undefined, unsupported by any published or publicly accessible policy, and offered without any meaningful explanation of what conduct supposedly constituted a violation. Neither YouTube nor any distributor provided a clear or coherent basis for the termination, leaving Plaintiff without information that could be reviewed, understood, or challenged.

23.    Despite exercising reasonable diligence, Plaintiff did not and could not discover Defendants' wrongful conduct until substantially later, informed by the cumulative effect of evidence and communications obtained over time, including internal email directives produced during litigation involving Create Music Group ("CMG") (e.g., Exhibit I), among other things. These internal materials reflected purge instructions, coercive pressures, and coordinated enforcement action and materially contributed to revealing YouTube's concealed role. Prior to obtaining this information, Plaintiff had no access to internal directives, enforcement rationales,

or communications capable of revealing YouTube's involvement, and therefore could not have discovered the facts giving rise to its claims within the limitations period.

24.      Accordingly, Defendants' active concealment therefore tolled the statute of limitations under CPLR § 203(g) and New York common law.

25.      The harm is not merely historical. To this day, YouTube continues to actively suppress SocialRyse's catalog by applying "invalid reference," "potential violation," and related enforcement flags to Plaintiff's 100%-owned sound recordings (e.g., "Clouds -- Zephyr"). (Exhibit L). These flags cause Plaintiff's references to be treated as ineligible for monetization, discourage distributors from reinstating or carrying Plaintiff's catalog, and result in the removal or deactivation of Plaintiff's reference files across multiple distributors. As a direct and ongoing result, Plaintiff's monetization revenue has been reduced to near-zero levels, and Plaintiff continues to suffer new financial injury on a daily basis. Defendants' conduct therefore constitutes a continuing tort under New York law.

25a. Following the terminations, Plaintiff diligently attempted to reinstate its catalog through multiple distributors, but YouTube's covert 'invalid reference' and 'potential violation' flags made reinstatement impossible.

25b. Upon information and belief, Defendants' continued application of unpublished enforcement flags---including "invalid reference," "potential violation," and related internal designations---functioned as a covert, platform-wide ban on Plaintiff's catalog. These non-public classifications operated as a de facto blacklist, preventing any authorized distributor from uploading or monetizing Plaintiff's 100%-owned works, regardless of ownership or compliance. This covert exclusion has never been disclosed to Plaintiff, and no neutral procedure exists to challenge or

remove these flags. As a result, Plaintiff has been effectively and indefinitely barred from reentering the market for automated monetization through Content ID.

25c. Plaintiff also repeatedly attempted to communicate with the distributors who removed its catalog, but those inquiries went unanswered. Upon information and belief, distributors were unable or unwilling to engage with Plaintiff due to YouTube's non-public directives, coercive pressure, and concealed enforcement actions, which prevented distributors from providing clarification or reinstating Plaintiff's works.

26.    YouTube maintains monopoly power in the market for online video monetization platforms. Its coordination with dominant industry participants to suppress independent labels like SocialRyse constitutes exclusionary, anticompetitive conduct that harms competition, innovation, and consumer choice.

## CAUSES OF ACTION

### AS FOR THE FIRST CAUSE OF ACTION
**Tortious Interference with Contract (New York Law)**

27.    Plaintiff realleges paragraphs 1-26 as if fully set forth herein.

28.    Plaintiff had a valid, enforceable Distribution Agreement with CMG. (Exhibit B).

29.    Defendants knew of this Agreement through their direct dealings with CMG regarding SocialRyse's catalog and royalties.

30.    Defendants intentionally and without justification procured CMG's breach of this Agreement by using wrongful means, including coercive threats of severe penalties (e.g., "the hammer falls on Create") to coerce CMG to stop performing its contractual obligations to SocialRyse, including the continued distribution, monetization, and administration of SocialRyse's catalog under the Agreement. But for Defendants' coercion and interference, CMG would have

continued to perform under the automatically renewing Agreement, and SocialRyse would have continued to receive substantial and growing monetization revenue from its catalog in future periods. Defendants' interference therefore directly caused the loss of both existing monetization income and projected future monetization revenue. (Exhibit I; Exhibit B).

31.     But for Defendants' tortious interference, coercion, and behind-the-scenes pressure applied to Plaintiffs distributor, CMG would have continued performing under the automatically renewing Agreement, generating enormous revenue for SocialRyse.

32.     As a direct and proximate result, SocialRyse has been damaged in an amount to be proven at trial, but not less than $75,000, including lost past and future royalties.

## AS FOR THE SECOND CAUSE OF ACTION
### Tortious Interference with Prospective Economic Advantage

33.     Plaintiff realleges paragraphs 1-32 as if fully set forth herein.

34.     Plaintiff had a reasonable expectancy of future economic benefits, including: (a) the continued monetization and automatic renewal under its existing CMG distribution Agreement; (b) expanding exploitation of its rapidly growing music catalog through that agreement; and (c) improved revenue share and commercial leverage with CMG as a direct result of sustained, high-volume performance; This expectancy was grounded in the proven, exponential revenue growth YouTube itself had previously approved and facilitated.

35.     Defendants intentionally, and by dishonest means (coercion, retroactive enforcement rationales, and concealment), interfered with these prospective relationships.

36.     Defendants' primary motive was to eliminate a successful independent competitor at the behest of larger partners.

37.     This interference directly destroyed SocialRyse's business and caused losses exceeding hundreds of millions of dollars in projected revenue (Exhibit D), amounting to damages well in excess of $75,000.

### AS FOR THE THIRD CAUSE OF ACTION
**Unfair Competition and Deceptive Acts (N.Y. GBL §§ 349-350)**

38.     Plaintiff realleges paragraphs 1-37 as if fully set forth herein.

39.     Defendants' deceptive acts and practices were consumer oriented. YouTube publicly represents that its Content ID monetization system operates pursuant to neutral, transparent, and uniformly applied rules, and that creators and independent rights holders may compete on equal footing within its platform.

40.     In reality, Defendants secretly applied unpublished enforcement labels, blacklist flags, and coercive distributor directives to exclude independent rights holders from monetization, while falsely representing to creators, viewers, and the public that removals were distributor-initiated, policy-neutral, or beyond Defendants' control.

41.     These deceptive practices materially misled:

(a) creators selecting music for monetized videos;

(b) viewers led to believe YouTube supports independent content diversity; and

(c) independent rights holders deciding whether to invest resources in original catalog development.

Defendants' conduct reduced content diversity, suppressed competition, and distorted consumer choice within the marketplace.

42.     Defendants' misrepresentations to SocialRyse (Exhibits G, H) regarding their non-involvement were specifically intended to conceal these deceptive practices.

43.     As a direct result, SocialRyse has suffered injury. Plaintiff is entitled to treble damages, injunctive relief, and reasonable attorneys' fees under GBL § 349(h).

## AS FOR THE FOURTH CAUSE OF ACTION
### Fraudulent Concealment and Equitable Tolling

44.     Plaintiff realleges paragraphs 1-43 as if fully set forth herein.

45.     Defendants fraudulently concealed their direct role in the termination of Plaintiff's business by affirmatively representing to Plaintiff that independent third-party distributors alone had acted, and that YouTube itself "does not mediate" or control such actions (see Exhibit H), while simultaneously exercising backend enforcement control and pressure through those same distributors.

46.     Defendants' fraudulent concealment was based not on silence alone, but on affirmative misrepresentations made by identified YouTube personnel, including statements that YouTube "does not mediate" distributor decisions and "did not suspend" Plaintiff's assets, when in fact Defendants were actively directing, coercing, and enforcing those removals internally.

47.     These statements were false when made, were known by Defendants to be false, concerned facts uniquely within Defendants' exclusive knowledge, and were made with the intent to mislead Plaintiff and prevent the discovery of Defendants' wrongful conduct.

48.     Plaintiff reasonably relied on Defendants' misrepresentations and could not, through reasonable diligence, have discovered their falsity because: (a) Content ID enforcement criteria and blacklist flags are non-public; (b) distributors were compelled to comply under threat of retaliation; and (c) Defendants' internal directives and enforcement communications were inaccessible to Plaintiff.

49.     As a direct and proximate result of Defendants' fraudulent concealment and affirmative misrepresentations, Plaintiff's discovery of its claims was delayed. Despite Plaintiff's repeated

efforts to understand the cause of its sudden business termination, Defendants provided

inconsistent and misleading explanations, including statements falsely asserting that distributors

alone had acted and that YouTube exercised no enforcement authority over the removal of

Plaintiff's catalog. During this period, the enforcement label communicated to Plaintiff---

"Circumventing Content ID"---remained unclear, unexplained, and unsupported by any published

or accessible policy, and neither YouTube nor third-party distributors could identify what specific

conduct allegedly constituted such a violation. Plaintiff ultimately learned of Defendants' central

role only later, through the cumulative effect of internal communications and related materials

obtained over time, including documents first produced during litigation involving CMG and

internal email directives reflecting purge instructions and coercive enforcement pressure (e.g.,

Exhibit I), among other things. This information, which was unavailable to Plaintiff at the time of

the termination and concealed by Defendants' conduct and misrepresentations, was necessary to

reveal the true basis for YouTube's actions and could not have been discovered sooner through

reasonable diligence. As a direct and proximate result of Defendants' fraudulent concealment and

affirmative misrepresentations, Plaintiff's discovery of its claims was delayed. Accordingly,

pursuant to CPLR § 203(g) and New York common law, including Simcuski v. Saeli, 44 N.Y.2d

442 (1978), the statute of limitations for all related causes of action is equitably tolled, and

Defendants are estopped from asserting any statute-of-limitations defense.

### AS FOR THE FIFTH CAUSE OF ACTION
**Monopolization (Sherman Act § 2, 15 U.S.C. § 2)**

50.    Plaintiff realleges and incorporates by reference paragraphs 1 through 49 as if fully set

forth herein.

51.    The relevant product market is the market for automated, large-scale audiovisual content

monetization through proprietary fingerprint-based rights-management systems that (a) detect

copyrighted audio embedded within user-generated video content, (b) automatically allocate advertising and subscription revenue among multiple competing rights holders based on detected usage, and (c) permit monetization without pre-screening, individualized licensing negotiations, or direct contractual relationships between rights holders and video creators.

52.    This market excludes purported alternatives such as manual licensing, direct sponsorships, music streaming services, short-form social media platforms, or non-automated enforcement tools, none of which permit rights holders to monetize copyrighted music at scale across user-generated audiovisual content through automated detection and proportional revenue allocation. These alternatives lack functional interchangeability and are not reasonable substitutes.

53.    For independent rights holders seeking to monetize original music embedded in user-generated video content at scale, no economically viable substitute exists outside of Defendants' proprietary Content ID and related monetization systems.

54.    From the perspective of independent rights holders seeking to monetize copyrighted music embedded within user-generated audiovisual content at scale, automated fingerprint-based monetization systems such as YouTube's Content ID are not reasonably interchangeable with other purported alternatives. Content ID-style monetization operates through a single upstream license to an authorized distributor, followed by automated detection of copyrighted audio across user-uploaded videos and proportional allocation of advertising and subscription revenue based on detected usage, without individualized licensing negotiations or pre-approval of each creator or video. By contrast, alternatives such as manual or sync licensing, direct creator agreements, sponsorships, music streaming services, or short-form social media platforms do not permit independent rights holders to monetize copyrighted music embedded in long-form user-generated

video content through automated, platform-wide detection and revenue allocation at scale, and therefore are not reasonable substitutes capable of constraining Defendants' market power.

55.    Defendants control over ninety percent (90%) of long-form user-generated online video consumption in the United States, and effectively one hundred percent (100%) of commercially viable automated audiovisual monetization utilizing fingerprint-based rights-management systems.

56.    Defendants possess monopoly power in the relevant market, evidenced by their dominant market share, the absence of functional substitutes, and their ability to exclude competitors and independent rights holders without losing users, creators, advertisers, or revenue.

57.    Entry into the relevant market is foreclosed by substantial barriers, including but not limited                                                                                                          to:

(a)    massive data-scale fingerprinting and reference-file infrastructure requirements; (b)    exclusive control over monetization APIs and enforcement tools; (c)    entrenched network effects between creators, advertisers, and rights holders; and (d) distributor dependency on Defendants' CMS access and privileges, which Defendants may revoke or suppress at will.

58.    YouTube exercises exclusive authority over monetization access for audiovisual content through Content ID and related systems. This automated infrastructure identifies audiovisual and audio-only content within user-generated videos, apportions revenue among detected rights holders, and distributes monetization proceeds. Because YouTube's platform captures the overwhelming share of user-generated audiovisual consumption in the United States, rights holders cannot compete for monetization revenues at scale without access to YouTube's systems. YouTube's exclusionary actions targeted Plaintiff's catalog despite Plaintiff monetizing only its

own 100%-owned music assets within user-generated videos and despite the automated Content ID system allocating revenues solely on the basis of detected usage. Plaintiff did not monetize, claim, or exploit revenue from audiovisual content owned by any third party.

59.    Defendants YouTube LLC and Google LLC (collectively, "YouTube") entered into a contract, combination, and/or conspiracy with dominant audiovisual rights holders---whose commercially significant video works drive substantial platform viewership and monetization within user-generated content on YouTube---to restrain trade and exclude Plaintiff from the market for automated online video monetization.

60.    Upon information and belief, Defendants entered into agreements, combinations, and/or conspiracies with dominant audiovisual rights holders and their affiliated distributors to exclude independent monetization competitors, including Plaintiff, from the automated monetization market by invoking pretextual enforcement rationales and coercing distributor compliance under threat of punitive platform retaliation.

61.    Defendants' conduct constituted a group boycott, in which distributors were compelled to terminate Plaintiff's monetization access not through independent business judgment, but through Defendants' threats of CMS feature suppression, claim invalidation, and platform-wide monetization penalties.

62.    Plaintiff's monetization success resulted entirely from lawful exploitation of its own 100%-owned music catalog through YouTube's automated Content ID system, where revenue was allocated based on system-detected usage in videos uploaded by creators unaffiliated with Plaintiff. Plaintiff's rapidly increasing monetization performance reflected creator-driven usage and competitive growth within Content ID, expanding the proportional allocation of monetization revenues associated with Plaintiff's catalog.

63.    Upon information and belief, dominant audiovisual rights holders expressed concerns to YouTube regarding the increasing monetization success of independent rights holders---including Plaintiff---whose lawful growth signaled increasing competitive participation in monetization outcomes. YouTube agreed to and did coordinate with these dominant audiovisual rights holders to suppress independent monetization growth by targeting Plaintiff for exclusion from Content ID access.

64.    In furtherance of this conspiracy, YouTube abruptly invoked a retroactive and previously unpublished enforcement rationale labeled "Circumventing Content ID," despite Plaintiff's undisputed ownership of 100% of its catalog and the absence of any copyright, infringement, or policy violation. This rationale lacked neutral definition, published standards, or consistent application, and was deployed solely to remove Plaintiff from monetization access and foreclose continued competitive participation. This "circumventing" designation was pretextual and constituted coordinated exclusionary conduct designed to preserve revenue concentration among dominant audiovisual rights holders and eliminate independent monetization emerging through lawful catalog ownership and creator use.

65.    Defendants' exclusionary conduct operated both unilaterally, through YouTube's platform control and enforcement authority, and in coordinated alignment with dominant audiovisual rights holders whose interests were served by suppression of independent monetization participation.

66.    The conspiracy alleged herein is vertical in form and horizontal in effect: YouTube, acting in alignment with dominant audiovisual rights holders, jointly restrained trade by removing Plaintiff---an independent monetization competitor---from the sole economically viable platform for automated video-based monetization at scale.

67.     YouTube's conduct cannot be explained as legitimate unilateral enforcement. YouTube had internally approved Plaintiff's monetization model, confirmed its permissibility, and represented that monetization decisions were independent of YouTube's control. Internal communications later revealed YouTube's centralized enforcement authority and its directive influence over asset removal and monetization suppression.

68.     YouTube's actions are consistent with and indicative of concerted action: (a) shared economic motive aligned with dominant audiovisual rights holders; (b) coordinated removal of independent monetization competitors; (c) the invention and deployment of a pretextual enforcement rationale; and (d) termination of Plaintiff's automated monetization access concurrent with accelerating competitive growth.

69.     The conspiracy resulted in a group boycott. Plaintiff was denied access to Content ID monetization---the only scalable platform through which independent rights holders can viably compete for automated video-based monetization. Plaintiff's exclusion destroyed existing monetization, eliminated future revenue, and foreclosed market participation available to dominant audiovisual rights holders.

70.     The restraint is unreasonable and unlawful per se, and in the alternative, unlawful under the rule of reason. It suppressed independent output, reduced competition, and concentrated monetization revenue among dominant incumbents, without any legitimate business justification.

71.     Defendants possess and maintain monopoly power in the relevant market. YouTube controls the overwhelming majority of online video distribution and monetization transactions in the United States, and no competing platform offers a comparable Content ID-style fingerprinting and automated revenue-allocation system at scale.

72.     Defendants' monopoly is not the result of a superior product alone, but is reinforced by:

a. Exclusive control over automated rights enforcement infrastructure;

b. Closed-system monetization access;

c. Distributor dependency on YouTube's CMS privileges.

d. The inability of rights holders to monetize at scale without Defendants' participation.

73.     Defendants willfully acquired and maintained their monopoly power through exclusionary conduct, including but not limited to:

a. Targeted exclusion of independent rights holders, including Plaintiff, from automated monetization access through coercive distributor pressure;

b. Retroactive application of newly asserted enforcement rationales, including allegations labeled "Circumventing Content ID," presented without prior notice, any published standards, or neutral enforcement criteria, to remove Plaintiff from competitive participation after Plaintiff had already achieved rapid market traction;

c. Coercion of third-party distributors under threat of punitive CMS feature restrictions and claim suppression (Exhibit I);

d. Secret purge directives and enforcement pressure compelling distributor compliance under threat of commercial retaliation (Exhibit I; Exhibit J);

e. Invalidation of reference files and revenue-limiting tactics, designed to suppress Plaintiff's earnings and discourage continued monetization (Exhibit J);

f. Upon information and belief, maintaining a de facto blacklist that resulted in cascading refusals and removals by multiple distributors after Plaintiff's forced CMG termination.

74.     Internal communications evidence that Defendants exerted coercive leverage over CMG's Content ID operations. On January 13, 2021, YouTube employee Ian Connelly warned CMG that

"the hammer falls on Create, not these folks," signaling punitive consequences for non-compliance (Exhibit I). Additional communications threatened CMS feature redactions and universal claim suppression unless CMG complied (Exhibit I).

75.    As a direct and intended result of this coercion, CMG terminated monetization of Plaintiff's catalog in or about March 2021 (Exhibit J). Other distributors, including Route Note, subsequently followed suit using the same "circumvention" rationale (Exhibit C).

76.    Defendants' actions departed from any legitimate, neutral, or consistently applied enforcement standards. Plaintiff owned one hundred percent (100%) of the copyrighted sound recordings and musical compositions it monetized. Plaintiff's revenue was generated solely through YouTube's automated fingerprinting and allocation systems based exclusively on detected usage of Plaintiff's music (Exhibit M).

77.    Defendants' actions were not competition on the merits but instead constituted deliberate market foreclosure of a rapidly scaling independent rights holder in order to preserve incumbent dominance and prevent revenue dilution across competing claimants.

78.    Defendants' exclusionary conduct harmed competition by:

  o   Eliminating independent rights holders from the monetization market.

  o   Concentrating revenue among dominant labels and platform partners;

  o   Suppressing alternative monetization models;

  o   Reducing price competition in content licensing.

79.    Defendants' conduct also caused direct consumer harm, including reduced catalog diversity available to creators and viewers, diminished music discovery, suppression of independent artist exposure, and artificial concentration of earnings within dominant incumbents.

80.    Defendants' exclusionary conduct caused antitrust injury, not merely harm to Plaintiff. By eliminating independent rights holders from automated monetization, Defendants suppressed output, reduced competition, concentrated revenue among dominant incumbents, and diminished catalog diversity available to creators and consumers.

81.    At the time of Defendants' interference, Plaintiff's revenues were accelerating at a rapidly compounding monthly rate, directly resulting from its active promotional business model and expanding catalog distribution. But for Defendants' misconduct, Plaintiff would have continued to scale through the automatic renewal of its distribution agreement with CMG and expanding voluntary creator adoption.

82.    Defendants' misconduct therefore severed Plaintiff from the sole economically viable monetization channel for its catalog, capable of generating in excess of hundreds of millions in monetization revenue over its natural commercial life and terminated Plaintiff at its moment of maximum commercial velocity---destroying not only current income, but all future market participation, goodwill, and growth trajectory. Defendants' intentional interference supports recovery to the full destruction value of the business, including lost future profits, lost goodwill, and permanent loss of market access.

83.    In addition to outright termination, Defendants employed revenue-limiting and suppression tactics---including 'invalid reference' flags, and monetization holds---which artificially reduced Plaintiff's earnings and further entrenched Defendants' exclusionary control.

84.    In the alternative, Defendants engaged in attempted monopolization through:

- o    Specific intent to exclude independent competitors;

- o    Predatory exclusionary conduct;

o   A dangerous probability of achieving monopoly power, which Defendants in fact already possess.

85.    As a direct and proximate result of Defendants' conspiracy and concerted action under Section 1 and exclusionary conduct under Section 2, Plaintiff has suffered and continues to suffer injury to its business and property, including destruction of revenue streams, loss of future profits, loss of goodwill, and permanent impairment of market access. Damages exceed hundreds of millions of dollars over the natural commercial life of Plaintiff's catalog.

## AS FOR THE SIXTH CAUSE OF ACTION
### Declaratory and Injunctive Relief (28 U.S.C. §§ 2201--2202)

85.    Plaintiff realleges paragraphs 1-84 as if fully set forth herein.

86.    An actual and substantial controversy exists between the parties regarding the lawfulness of Defendants' conduct.

Plaintiff seeks a judicial declaration that:

a. Plaintiff operated within the monetization framework administered through YouTube's Content ID system via authorized distributors;

b. YouTube's retroactive and continued use of a "Circumventing Content ID" enforcement rationale to terminate and suppress plaintiff's previously approved, 100%- owned catalog was unlawful;

c. YouTube tortiously interfered with SocialRyse's contract with CMG; and

d. The ongoing application of "invalid reference," "potential policy violation," and similar revenue suppression flags to SocialRyse's catalog is unlawful.

87.    Plaintiff seeks a permanent injunction requiring Defendants to:

a. Immediately remove all "invalid reference," "circumventing," "potential policy violation," and

related suppression flags from SocialRyse's 100%-owned assets in YouTube's systems;

b. Restore full Content ID monetization access for SocialRyse's catalog on a non-discriminatory basis, either directly or through CMG and/or any authorized distributor;

c. Refrain from any further retaliation, blacklisting, or interference with SocialRyse's business; and

d. Disclose all internal lists, flags, or instructions referencing SocialRyse, SRMD, or Ralph Cohen.

e. Defendants shall be enjoined from directly or indirectly interfering with Plaintiff's lawful distribution relationships or monetization through Content ID, whether by coercion, retaliation, blacklisting, revenue suppression, or distributor pressure.

88.    Even if reinstatement were theoretically ordered, Defendants' prior purge directives and coercive distributor communications have irreversibly chilled Plaintiff's distribution relationships. Distributors have been warned, explicitly and implicitly, that association with Plaintiff risks punitive consequences. As a result, Plaintiff cannot realistically re-enter the market absent substantial compensatory damages reflecting the permanent destruction of goodwill, distribution access, and future revenue.

## AS FOR THE SEVENTH CAUSE OF ACTION
### Punitive Damages

89.    Plaintiff realleges paragraphs 1-88 as if fully set forth herein.

90.    Defendants' conduct, as alleged herein, was willful, malicious, wanton, and undertaken with reckless disregard for Plaintiff's rights. It involved a pattern of coercion, deceit, and anticompetitive behavior aimed at destroying a lawful business.

91.    An award of punitive damages is necessary to punish Defendants and deter them and others from engaging in similar misconduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff SocialRyse LLC respectfully requests that this Court enter judgment in its favor and against Defendants YouTube LLC and Google LLC, as follows:

A. Compensatory damages in an amount to be proven at trial, but not less than $75,000, for all lost revenue, profits, and other harms;

B. Treble damages pursuant to 15 U.S.C. § 15 and N.Y. GBL § 349(h);

C. Punitive and exemplary damages;

D. A declaratory judgment as set forth in Count VI;

E. A permanent injunction as set forth in Count VI;

F. Pre- and post-judgment interest at the maximum lawful rate;

G. Reasonable attorneys' fees and the costs and expenses of this action; and

H. Defendants' anticompetitive conduct entitles Plaintiff to:

I. Treble damages under 15 U.S.C. § 15;

J. Disgorgement of unlawfully obtained revenues;

K. Injunctive relief prohibiting further interference with lawful monetization and distributor relationships;

L. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 7, 2025

Respectfully submitted,

/s/ Courtney K. Davy_____
COURTNEY K. DAVY, ESQ.
Attorney for Plaintiff
299 Broadway, Suite 800

New York, NY 10007
(516) 850-1800