UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
SOCIALRYSE LLC.,

|                          |                              |
|--------------------------|------------------------------|
| Plaintiffs,              | AMENDED COMPLAINT            |
| -against –               | Civil Action No. 25-cv-10337- |

LAK
YOUTUBE LLC and GOOGLE LLC.,                    [Jury Trial OF Demanded]

Defendants.
-----------------------------------------------------------------------X

## PRELIMINARY STATEMENT

1. This action arises from Defendants' coercive termination and ongoing suppression of Plaintiff SocialRyse LLC's participation in YouTube's automated monetization ecosystem. Defendant YouTube LLC ("YouTube") operates the Content ID and related monetization systems through which Plaintiff's 100%-owned original music catalog generated more than $600,000 in royalty revenue between September 2020 and January 2021, reflecting YouTube's approval of Plaintiff's participation in that ecosystem. Defendant Google LLC ("Google") owns and controls YouTube. Google and YouTube are referred to collectively herein as "Defendants." In early 2021, YouTube directed and pressured Plaintiff's distributor, Create Music Group ("CMG"), to purge Plaintiff's catalog and cease monetization through escalating threats of CMS feature suppression, claim suppression, and platform retaliation directed at CMG's broader operations. Defendants later concealed and misrepresented YouTube's role by telling Plaintiff that CMG had acted independently, while non-public backend enforcement flags, related internal restrictions, and distributor-facing pressure continued to impair Plaintiff's catalog and caused authorized distributors to refuse, terminate, or decline to reinstate monetization across platforms. As a result,

Plaintiff was excluded from the relevant automated monetization market and suffered substantial and continuing economic harm.

## PARTIES

2. Plaintiff SocialRyse LLC is a New York limited liability company with its principal place of business in Brooklyn, New York. Its sole member is Ralph Cohen, a citizen of New York.

3. Defendant YouTube LLC is a Delaware limited liability company with its principal place of business in San Bruno, California, and is a wholly owned subsidiary of Google LLC. Upon information and belief, all its members are citizens of states other than New York.

4. Defendant Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California. Upon information and belief, all its members are citizens of states other than New York.

## JURISDICTION AND VENUE

5. This Court has diversity jurisdiction under 28 U.S.C. § 1332. There is complete diversity of citizenship between Plaintiff (New York) and Defendants (California/Delaware), and the amount in controversy far exceeds $75,000.

6. This Court has federal question jurisdiction under 28 U.S.C. § 1331 for claims arising under the Sherman Act, 15 U.S.C. § 2.

7. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred here, Plaintiff resides and suffered injury here, and Defendants transact substantial business here.

## FACTUAL ALLEGATIONS

**A. Plaintiff's Business and Original Music Catalog**

8. SocialRyse, founded in 2018, created and owned the copyrights of an original music catalog. Plaintiff operated its music catalog through its label entity SocialRyse Music Disco ("SRMD"), including the production-music brand "Music-4-Videos." The broader SRMD catalog consisted primarily of instrumental music, created for use in audiovisual media. The Music-4-Videos brand consisted of original instrumental music marketed as "music specifically designed to enhance content" for online video creators. Individual works within the catalog were released under various artist stage names associated with SRMD—an industry-standard practice in production-music catalogs used to organize and market catalog works—while Plaintiff retained ownership and control of the copyrights in all such works.

9. SocialRyse lawfully enrolled its catalog in YouTube's automated monetization system through authorized distributors, including AdRev and Create Music Group ("CMG"). YouTube's system automatically detects copyrighted audio embedded in user-uploaded videos and allocates proportional advertising and subscription revenue to the rights holders whose audio is detected. Revenue is allocated based on system-detected usage and is distributed through authorized distributor intermediaries.

10. Plaintiff promoted its music catalog to independent YouTube creators and encouraged those creators to incorporate Plaintiff's music into their videos in a manner that enhanced the creators' content. In certain instances, Plaintiff entered into promotional arrangements with creators in connection with their use of Plaintiff's music, consistent with common practices in digital music marketing. Independent creators voluntarily chose whether to incorporate Plaintiff's tracks into their long-form videos. Plaintiff did not control the non-music content of third-party videos in which Plaintiff's music appeared. Plaintiff's sound recordings were detected and

monetized through YouTube's Content ID system when Plaintiff's music was identified within independently uploaded videos.

11. Through the Music-4-Videos catalog and the other songs under SRMD, Plaintiff supplied music used by independent video creators across the YouTube platform and participated in YouTube's automated Content ID monetization ecosystem.

### B. AdRev and YouTube's Prior Approval

12. In June 2020, YouTube, through distributor AdRev, inquired about SocialRyse's business model. Jesse Worstell, AdRev's VP of Rights Management, emailed Plaintiff on June 8, 2020, stating that "YouTube is asking for more information on the content we are monetizing for you because of the nature of the claims." (Exhibit A). SocialRyse responded transparently, explaining that it was an original music catalog promoted to YouTube creators, that SocialRyse did not operate or control the channels through which its music appeared, and that certain creators used SocialRyse's music in their videos pursuant to promotional arrangements. (Exhibit A). AdRev subsequently confirmed that YouTube had approved continued monetization, stating: "Yes! All good." (Exhibit A).

### C. The CMG Distribution Agreement

13. On August 5, 2020, SocialRyse entered into a Distribution Agreement with CMG (the "Agreement"). (Exhibit B). Under the Agreement, CMG served as Plaintiff's exclusive distributor during the Term for the sound recordings Plaintiff delivered to CMG, and held the exclusive right to deliver the catalog to YouTube as reference files and to administer Content ID/Content Claiming monetization. (Exhibit B, §§ 3–4). Plaintiff was entitled to an 85% net revenue share of YouTube Content ID income. (Exhibit B, § 5(vi)). The Agreement also provided for monthly accountings

and payment within thirty (30) days after each month in which revenue was earned. (Exhibit B, § 6(a)).

14. The Agreement had an initial one-year term with automatic annual renewals, terminable only upon ninety (90) days' prior written notice before the end of the applicable term or renewal period. (Exhibit B, § 1).

15. Critically, Section 7 of the Agreement provided that CMG could terminate immediately only upon: (i) material breach by Licensor; (ii) general assignment for the benefit of creditors; (iii) filing of a voluntary or involuntary bankruptcy petition; or (iv) appointment of a trustee or receiver. (Exhibit B, § 7). The Agreement contained no provision permitting termination based on third-party platform directives, compliance pressure, or enforcement concerns raised by YouTube.

16. Section 13(j) of the Agreement further provided that "[n]either party shall be in default of any term, condition, or provision of this Agreement unless and until the other party gives written notice specifying such default in detail and such default, if curable, shall not have been cured within thirty (30) days after receipt of such notice." (Exhibit B, § 13(j)).

**D. Revenue Growth and Performance**

17. Under the Agreement, SocialRyse's revenue grew rapidly, generating over $600,000 in net royalties from YouTube between September 2020 and January 2021. Monthly net revenue grew from approximately $28,790 in August 2020 to $216,038 in December 2020 (Exhibit D).

18. The vast majority of videos incorporating Plaintiff's music were long-form user-generated videos uploaded independently by third-party creators. These videos regularly exceeded several minutes in duration and generated sustained advertising revenue through multiple ad

insertion points (pre-roll, mid-roll, and post-roll ads), creating larger monetization windows per video than short-form content on any competing platform.

19. The monetization revenue generated from Plaintiff's catalog was earned on a worldwide basis, pursuant to YouTube's default monetization policies, which apply globally. However, the monetization system, enforcement decisions, distributor relationships, and revenue allocation mechanisms were designed, controlled, and administered by YouTube from the United States, including through U.S.-based personnel, systems, and contractual controls.

**E. Defendants' Coercive Enforcement Campaign**

20. Upon information and belief, in early 2021, commercially significant audiovisual rights holders—including entities whose video content generated substantial viewership and monetization revenue within user-generated content on YouTube's platform—pressured Defendants regarding the growing monetization success of independent music rights holders. The concern, as relayed through distributors to Plaintiff, was that independent music rights holders were capturing an increasing share of monetization revenue within YouTube's automated monetization ecosystem. Because monetization revenue from videos containing multiple detected works was allocated, under YouTube's own system rules, among the participating rights holders whose content was detected, the growth of independent music catalogs resulted in a larger share of monetization revenue being allocated to independent participants, correspondingly reducing the share retained by commercially dominant audiovisual incumbents. Upon information and belief, these incumbents sought to protect or increase their share of monetization revenue within YouTube's automated monetization ecosystem.

21. As CMG informed Plaintiff in its March 1, 2021 termination email, "the nature of the activity circumvents Content ID and hinders other 3rd party rights holders, who have begun their

own investigations into this matter." (Exhibit J). This statement, relaying YouTube's enforcement rationale, explicitly linked the enforcement action to pressure from third-party rights holders whose revenue share was threatened by the growing success of independent music rights holders in YouTube's automated monetization ecosystem.

22. Despite the fact that SocialRyse had no direct contractual agreement with YouTube governing Content ID access and participated in monetization solely through authorized third-party distributors, and despite SocialRyse's undisputed ownership of 100% of the copyrights in the original sound recordings and musical compositions it distributed, YouTube targeted SocialRyse's monetization operations through covert and coercive means.

23. YouTube orchestrated the termination of Plaintiff's monetization. Through internal directives and pressure exerted through YouTube's control over CMS access and claim-processing privileges, YouTube compelled CMG—and later other distributors—to deactivate Plaintiff's reference files and suspend its assets indefinitely. CMG then issued the termination notice that publicly attributed the suspension to YouTube's enforcement directives. (Exhibit J). Before Plaintiff learned of CMG's suspension of its catalog, Plaintiff sought clarification from YouTube Rights Management regarding YouTube's policies, including whether revenue-sharing arrangements between rights holders and third-party channels were permitted. YouTube did not identify such arrangements as violating any published Content ID rule applicable to rights holders, and instead stated that such arrangements were outside YouTube's scope and should be handled by the involved parties. Those communications did not disclose that YouTube was then moving toward enforcement action against Plaintiff's catalog. (Exhibit G). YouTube later further concealed its role by affirmatively misrepresenting to Plaintiff—even after Plaintiff forwarded the CMG termination letter expressly attributing the suspension to YouTube's enforcement

directives—that the termination decision was solely CMG's independent action and that YouTube had no involvement. (Exhibit E; Exhibit H). YouTube intended that CMG terminate Plaintiff's monetization relationship and took actions designed to ensure that outcome.

24. On February 9, 2021, YouTube employee Ian Connelly directed CMG to conduct a "strong purge" of certain artists and assets. In the same communication chain, Connelly stated that he was "getting pressure from the team" and warned that, absent compliance, "the team will likely redact some features or put all claims to pending (which I'm sure you won't want)." (Exhibit I). These communications reflect escalating internal enforcement pressure within YouTube and threats of commercial retaliation against CMG if it did not comply.

25. On January 13, 2021, Connelly explicitly warned CMG: "As you remember with T&S the hammer falls on Create, not these folks.." (Exhibit I). This statement signaled that YouTube would impose punitive consequences on CMG itself—not on the individual labels—unless CMG complied with YouTube's enforcement demands.

26. On or about April 14, 2021, YouTube's Trust & Safety personnel transmitted additional communications to CMG containing expanded directives to remove multiple artists' reference files, including a list of specific artists and assets to be deactivated, in furtherance of the coerced enforcement campaign. (Exhibit I).

27. Notably, the Exhibit I communications reveal that CMG itself recognized certain labels—including SocialRyse by name—as having legitimate activity. CMG employee Alexandre Williams stated to YouTube that "for certain legitimate artists & labels that show irregular activity but have a longer history of legitimate activity with us we conduct a much more thorough audit before we terminate." (Exhibit I). Williams further stated: "Socialryse is the only one with a formal licensing website so our team had warned them but given them the benefit." (Exhibit I). Despite

this, YouTube's escalating pressure compelled CMG to terminate SocialRyse regardless. Any such informal distributor communication did not identify any specific policy violation by Plaintiff and did not constitute formal notice, due process, or the contractual cure notice required under the CMG Agreement.

### F. CMG's Termination and Cascading Exclusion

28. On March 1, 2021, CMG sent Plaintiff a form termination email stating: "We want to inform you that YouTube has informed us that the licensing activity in which you are engaged in must cease because YouTube has determined that this activity is a violation of YouTube's Terms of Service. Moreover, the nature of the activity circumvents Content ID and hinders other 3rd party rights holders, who have begun their own investigations into this matter. As such, we have no choice but to suspend your assets indefinitely, including any potential claims and royalties tied to the assets flagged by YouTube's Abuse team." (Exhibit J).

28a. CMG's form termination email relayed a stated enforcement conclusion but did not disclose the coercive directives YouTube had issued to CMG, the threats of CMS feature suppression and claim suppression that compelled CMG's compliance, YouTube's internal communications identifying specific artists and assets for removal, or the non-public backend enforcement flags that would prevent Plaintiff from reinstating its catalog through any authorized distributor. The communication attributed the suspension to a stated YouTube policy determination but concealed the coercive mechanism, scope, and orchestrated nature of YouTube's enforcement campaign. Plaintiff had no means of distinguishing between a distributor's independent compliance decision based on a platform policy communication and a termination coerced through threats of commercial retaliation directed at the distributor itself.

29. CMG's termination of monetization for SocialRyse's catalog fell outside every enumerated termination ground in Section 7 of the Agreement. SocialRyse had not committed any material breach of the Agreement. SocialRyse had not made a general assignment for the benefit of creditors, filed for bankruptcy, or been subjected to the appointment of a trustee or receiver. (Exhibit B, § 7). CMG did not provide the thirty-day written cure notice required by Section 13(j) of the Agreement before taking action. (Exhibit B, § 13(j)). The Agreement contained no provision permitting termination based on YouTube enforcement directives, alleged "circumvention" concerns, or any third-party platform policy rationale.

30. Following CMG's termination, additional distributors implemented similar removals and refusals. On or about July 13, 2021, RouteNote informed Plaintiff that its content had been "directly involved in YouTube Partner Programme circumvention" and that "action has been taken to remove your assets from YouTube and all payments on your account will be frozen until such time as an investigation has concluded." (Exhibit C). Plaintiff immediately responded, demanding to know which YouTube Terms of Service had been violated and requesting proof that YouTube had directed RouteNote to act. RouteNote did not identify any specific policy violation, did not explain what conduct purportedly constituted circumvention, and did not provide any evidence of a YouTube directive. RouteNote stated only that it was "investigating" and that it would "contact you when more details are available." RouteNote never provided those details, never concluded the stated investigation, and never contacted Plaintiff with any findings. These cascading terminations occurred despite no contractual breach by SocialRyse and were economically irrational for the distributors absent external pressure, as SocialRyse's catalog was generating rapidly accelerating revenue at the time. Plaintiff owned the undisputed copyright to the sound recordings in its catalog. Plaintiff received revenue only for the portion of each video containing

its copyrighted music, as detected and allocated by YouTube's Content ID system. If other rights holders' content also appeared in the same video, those rights holders likewise received their respective shares automatically under YouTube's own monetization rules. Plaintiff's claims therefore did not appropriate or interfere with the rights of any other rights holders.

31. At the time of YouTube's enforcement action, Plaintiff's catalog had already been incorporated into tens of thousands of videos across the platform, generating hundreds of millions of views and substantial automated monetization activity through Content ID. YouTube nevertheless imposed a blanket enforcement action across Plaintiff's entire catalog without identifying any unresolved claim or specific policy violation that would justify the removal of all reference files and monetization rights.

## G. Defendants' Concealment and Misrepresentations

32. After CMG relayed a stated YouTube policy concern without further detail or specificity, Plaintiff sought clarification from YouTube regarding the stated concern and whether any platform policy had been violated. On or about February 23–25, 2021, YouTube's Rights Management team responded to Plaintiff's inquiry by stating that revenue-sharing arrangements with channels were 'out of our scope' and 'YouTube does not mediate on this anymore.' YouTube further stated: 'YouTube is the platform and we provide the copyright tools, however, when it comes to what happens to the video and how revenue goes with the claimed video, this should be addressed and handled by the involved parties only.' (Exhibit G). These representations affirmatively indicated that revenue-sharing arrangements between labels and channels were matters for private parties and were not subject to YouTube enforcement action, directly contradicting the enforcement role YouTube was simultaneously exercising internally through the coercive directives described in Exhibit I.

33. The February 23–25, 2021 communications with YouTube's Rights Management team were part of Plaintiff's good-faith diligence and attempt to obtain clarification of YouTube's policies. Those communications, together with Plaintiff's contemporaneous exchanges with CMG, reflected confusion and uncertainty as to how any "circumvention" policy could apply to original music promoted to unaffiliated third-party channels. Those communications demonstrate diligence, not notice of wrongdoing.

33a. In late February 2021, as part of these ongoing efforts to understand YouTube's policies, Plaintiff and Plaintiff's CMG partner manager were in active communication regarding the scope of permitted activity within YouTube's monetization ecosystem. At the partner manager's direction, Plaintiff posed questions to YouTube's support team regarding whether certain monetization activity was permitted under YouTube's policies. YouTube's support team did not identify the described activity as a violation of any policy applicable to rights holders, and instead indicated that such matters were outside YouTube's scope and should be handled by the involved parties.

34. Beginning on February 26, 2021, Plaintiff sent a written inquiry to YouTube Legal seeking clarification regarding the suspension and the basis asserted for it. In that correspondence, Plaintiff explained that it did not operate or control the YouTube channels through which the monetization activity at issue occurred and did not control their content. On March 2, 2021, YouTube requested additional identifying information so that the matter could be reviewed. Plaintiff thereafter provided a list of affected sound recordings identified by ISRC codes on March 5, 2021. On March 10, 2021, YouTube Legal Support responded that the inquiry appeared to involve a different department and directed Plaintiff to contact them. Plaintiff thereafter contacted that department and, over the following months, repeatedly followed up with both them and

YouTube's legal team, seeking clarification regarding the suspension of Plaintiff's music. YouTube did not respond to any of those follow-up communications and did not disclose the basis for the enforcement action or its role in that action.

35. On July 7, 2021, Plaintiff contacted YouTube's Partner Support team, forwarded CMG's communications referencing YouTube's enforcement directives, provided a list of affected sound recordings identified by ISRC codes, and requested clarification regarding the suspension and reinstatement of Plaintiff's catalog.

36. YouTube acknowledged Plaintiff's inquiry and requested additional information regarding the music at issue, asking Plaintiff to "provide me with the list of music." In response, Plaintiff supplied a list of sound recordings from its catalog identified by their ISRC codes so that YouTube could review the specific assets in question. On July 8, 2021, YouTube Partner Support representative Edjun responded that YouTube had not suspended Plaintiff's assets and indicated that the termination decision was made by CMG. Edjun wrote: "Based on the screenshots you sent, it looks like it was Create Music Group who suspended your assets and removed your references through their CMS. This can only be done on their end since you are under their network, and they have access to manage your contents. YouTube is not able to suspend your assets as you do not have a CMS account with us." Edjun further stated: "Although there were findings presented to your distributor, it is still their decision on what action to take. The decision to suspend your assets and remove your references was made by Create Music. We're not able to mediate between you and your distributor." Edjun further advised Plaintiff: "If you strongly believe that Create Music made a mistake in their decision and you're not able to come to an agreement with them, you may consider seeking legal advice to check for options you may take legally" (Exhibit H). This statement affirmatively directed Plaintiff to pursue legal remedies against CMG rather than

YouTube. (Exhibit H). This response came after Plaintiff had already supplied YouTube with the specific sound recordings at issue via ISRC codes, and after Plaintiff forwarded CMG communications expressly attributing the suspension to YouTube's enforcement directives.

36a. On July 11, 2021, YouTube Partner Support representative Haze reiterated that YouTube did not suspend Plaintiff's music and again stated that YouTube does 'not mediate between creators and distributors' (Exhibit H). These repeated denials, coming from multiple YouTube representatives over multiple days, reinforced YouTube's misrepresentation that CMG had acted independently and that YouTube played no role in the suspension of Plaintiff's catalog.

37. These statements were knowingly false and misleading. YouTube's July 8, 2021 response constituted a specific, affirmative misrepresentation that attributed the suspension solely to CMG's independent decision, denied YouTube's operative role, and directed Plaintiff to pursue legal remedies against CMG rather than YouTube — thereby actively redirecting Plaintiff away from YouTube and toward CMG as the party responsible for Plaintiff's injury. The internal communications in Exhibit I demonstrate that YouTube did not merely "present findings" to CMG; YouTube employee Ian Connelly actively directed CMG to conduct a "strong purge," threatened to "redact some features or put all claims to pending," and warned that "the hammer falls on Create" for non-compliance. YouTube exercised centralized enforcement authority over distributor Content ID systems, issued purge directives, and employed coercive measures to compel distributor compliance. YouTube's characterization of the termination as CMG's independent decision was an affirmative misrepresentation designed to conceal YouTube's orchestrating role.

38. YouTube possessed superior and exclusive knowledge of the concealed facts. The enforcement flags, purge directives, and internal communications described above existed only

within YouTube's internal systems and were not visible to Plaintiff. After Plaintiff directly inquired about the cause of the termination, YouTube provided affirmative statements denying that YouTube had suspended Plaintiff's assets and indicating that the termination decision belonged solely to CMG. Having chosen to speak on the issue, YouTube was required not to provide misleading or incomplete information regarding the true cause of Plaintiff's business termination.

## H. Timeliness, Delayed Discovery, and Equitable Estoppel

39. Plaintiff reasonably relied on Defendants' repeated representations that the distributors had acted independently. In reliance on those representations, Plaintiff directed its legal efforts toward CMG, initiating litigation against CMG concerning unremitted royalties. Although distributors relayed stated YouTube policy concerns, YouTube's direct statements denying its operative role and representing that the decision was solely CMG's reasonably led Plaintiff to pursue its claims against CMG as the party identified by YouTube itself as responsible. Plaintiff's decision to pursue litigation against CMG rather than YouTube was directly consistent with the course of action YouTube's own representative had recommended.

40. Plaintiff exercised reasonable diligence in attempting to ascertain the cause of its sudden business termination, including the following specific efforts:

      (a) On or about February 26, 2021, Plaintiff emailed YouTube Legal seeking reinstatement of Plaintiff's music and clarification regarding the suspension and the basis asserted for it.

      (b) YouTube's legal team responded and requested that Plaintiff provide specific details of the affected sound recordings.

      (c) Plaintiff provided the requested ISRC codes to YouTube.

(d) After receiving the ISRC codes, YouTube Legal Support responded by redirecting Plaintiff's inquiry to a different internal team rather than providing clarification regarding the suspension or the basis asserted for it. Plaintiff thereafter contacted that team and continued to follow up for months seeking clarification, but YouTube ceased responding to Plaintiff's inquiries.

(e) In July 2021, Plaintiff contacted YouTube Partner Support directly, explaining the situation and forwarding CMG's communications referencing YouTube's enforcement directives. (Exhibit H, Exhibit E).

(f) YouTube Partner Support responded by denying YouTube's involvement, representing that the decision was CMG's alone, and advising Plaintiff to seek legal advice against CMG. (Exhibit H).

(g) In 2023, Plaintiff approached additional distributors, including Collab Asia and Mango Music, in an attempt to reinstate its catalog, but those inquiries went unanswered. Plaintiff was able to access Venice Music through its self-service upload portal, uploaded a few original tracks under its catalog, and those tracks initially began generating revenue. Venice Music then deactivated the reference files shortly thereafter.

41. Plaintiff's discovery of Defendants' wrongful conduct occurred cumulatively over time. The internal communications produced during the CMG litigation and first reviewed by Plaintiff on or about March 1, 2023 materially advanced Plaintiff's discovery of Defendants' role by revealing purge directives, threats of CMS retaliation, and coercive enforcement pressure exerted on CMG by YouTube personnel. The later Venice Music disclosures in 2023 provided independent evidence of Defendants' ongoing enforcement mechanism, including backend flags

and cross-distributor restrictions that continued to suppress Plaintiff's catalog. Together, those disclosures revealed both Defendants' role in the original termination and the mechanism of Plaintiff's ongoing exclusion.

42. In or about May 2023, Plaintiff attempted to reinstate portions of its catalog through Venice Music's self-service portal for Content ID monetization. Plaintiff uploaded several sound recordings that had previously monetized through CMG, and those recordings initially began generating automated monetization revenue through Defendants' system under Venice Music. Shortly thereafter, Venice deactivated the associated reference files. On or about July 14, 2023, and in follow-up communications through August 2023, Venice informed Plaintiff that YouTube had flagged the recordings and provided Plaintiff with a screenshot (Exhibit L) showing, for the first time, that Plaintiff's assets were marked "Invalid reference" and "Potential violation of YouTube monetization policy." Venice explained that YouTube had associated the recordings with suspected attempts to circumvent YouTube's monetization policies and that distributors risk penalties if they monetize content YouTube deems ineligible. This was the first time Plaintiff had direct visibility into Defendants' backend enforcement flags and designations. These internal classifications functioned as a de facto blacklist that caused authorized distributors to deactivate, refuse, or decline to reinstate Plaintiff's reference files for monetization. Plaintiff had no mechanism to challenge or review these designations, and the flags, together with the threatened consequences to distributors who carried flagged catalogs, functionally foreclosed stable monetization across distributors. The affected catalog included works released under the artist stage name "Zephyr," including tracks such as Clouds, Believe, and Balloon, which were among the sound recordings subject to these enforcement designations.

43. It was through the combination of the internal CMG communications (Exhibit I)—revealing the "strong purge" directives, CMS threats, and coercive enforcement pressure—and the July-August 2023 Venice disclosure—revealing the mechanism of ongoing exclusion through backend flags—that Plaintiff was able to identify Defendants' central role in orchestrating the termination and ongoing suppression of Plaintiff's catalog.

44. Plaintiff initiated litigation against CMG on January 7, 2022. Plaintiff's decision to initiate litigation against CMG rather than Defendants was directly consistent with the course of action Defendants' own representatives recommended in the July 2021 communications (Exhibit H). During the CMG litigation, internal communications between YouTube and CMG (Exhibit I) were obtained through counsel. Plaintiff first reviewed those communications on or about March 1, 2023. Those communications materially advanced Plaintiff's discovery of Defendants' role by revealing purge directives, threats of CMS retaliation, and coercive enforcement pressure exerted on CMG by YouTube personnel. The Exhibit I communications, however, represented only a limited subset of CMG's communications with YouTube and did not disclose the full scope of Defendants' enforcement campaign against Plaintiff's catalog. The later Venice Music disclosures in 2023 provided independent evidence of Defendants' ongoing enforcement mechanism, including backend flags and cross-distributor restrictions that continued to suppress Plaintiff's catalog. Together, those disclosures revealed both Defendants' role in the original termination and the mechanism of Plaintiff's ongoing exclusion. In 2024, Plaintiff served targeted discovery requests in the CMG litigation seeking additional communications between CMG and YouTube concerning the enforcement action against Plaintiff's catalog. Plaintiff did not receive those additional communications during the CMG litigation. The CMG litigation concluded in June 2025 without Plaintiff obtaining those additional communications. Plaintiff commenced this action in

December 2025. Plaintiff's state-law claims are timely because they were filed within three years of Plaintiff's discovery of YouTube's coercive role and ongoing enforcement mechanism. Plaintiff's Sherman Act claim is likewise timely because it was filed within four years of that discovery. The information available to Plaintiff in February and March 2021 would not have been sufficient to state the claims asserted herein because the facts establishing YouTube's coercive conduct, affirmative misrepresentations, and ongoing enforcement mechanism were exclusively within YouTube's possession and were affirmatively concealed from Plaintiff.

45. Notice of a stated policy concern—such as CMG's relaying of YouTube's "circumvention" rationale in March 2021—is categorically different from knowledge that Defendants were coercing distributors under threat of platform retaliation while simultaneously denying involvement to Plaintiff. Plaintiff could not have known the true basis for its exclusion when the party responsible was affirmatively misrepresenting its role. Based on Defendants' repeated representations, Plaintiff reasonably believed that the termination resulted from independent distributor compliance decisions rather than direct orchestration by YouTube itself. Specifically, Plaintiff could not have known from the March 2021 form termination email or from YouTube's subsequent denials of involvement that: (a) YouTube employee Ian Connelly had directed CMG to conduct a 'strong purge' of artists and assets; (b) Connelly had threatened that absent compliance, YouTube would 'redact some features or put all claims to pending'; (c) Connelly had warned CMG that 'the hammer falls on Create' for non-compliance; (d) CMG itself had recognized SocialRyse as legitimate but was compelled to terminate regardless; or (e) YouTube had imposed non-public backend enforcement flags and related distributor-facing enforcement designations that caused authorized distributors to refuse, terminate, or decline to reinstate Plaintiff's catalog for automated monetization. Inquiry notice of a stated policy concern

does not constitute actual or constructive knowledge of a concealed cause of action against the party that affirmatively misrepresented its role in causing the injury.

46. Defendants are equitably estopped from asserting the statute of limitations as a defense. After Plaintiff forwarded CMG's communications expressly attributing the suspension to YouTube's enforcement directives and identified the affected assets by ISRC codes, Defendants affirmatively denied their operative role, attributed the suspension solely to CMG's independent decision, and directed Plaintiff to seek legal remedies against CMG. Plaintiff reasonably relied on those representations by pursuing litigation against CMG rather than Defendants. Defendants may not invoke a time bar that resulted from their own affirmative misdirection.

47. As of February and March 2021, the principal information available to Plaintiff regarding the cause of its suspension was CMG's attribution of its compliance decision to a stated YouTube policy concern. Plaintiff did not then know, and could not reasonably have known, that Defendants themselves had coerced CMG's enforcement action against Plaintiff through threats of CMS retaliation, had internally employed 'strong purge' directives and similar coercive enforcement pressure in connection with the removal of artists and assets, had concealed their own orchestrating role by denying involvement when Plaintiff inquired directly, or had imposed non-public backend enforcement flags and related enforcement designations that, together with Defendants' coercive leverage over CMS access, claim-processing privileges, and platform standing, caused Plaintiff's references to be treated as ineligible for monetization and caused authorized distributors to refuse, terminate, deactivate, or decline to reinstate Plaintiff's catalog for automated monetization. Specifically, the following facts were concealed from Plaintiff and could not have been discovered through reasonable diligence prior to the CMG litigation discovery and Venice disclosures: (a) that YouTube employee Ian Connelly had directed CMG to conduct a

'strong purge' of artists and assets; (b) that Connelly had threatened that absent compliance, YouTube would 'redact some features or put all claims to pending'; (c) that Connelly had warned CMG that 'the hammer falls on Create' for non-compliance; (d) that CMG itself had recognized SocialRyse as a legitimate label but was compelled to terminate regardless of that assessment; and (e) that YouTube had imposed non-public 'invalid reference' and related backend enforcement flags that functioned as a cross-distributor blacklist causing authorized distributors to refuse, terminate, or decline to reinstate Plaintiff's catalog for automated monetization. Plaintiff first obtained substantial evidence of Defendants' direct coercive role upon reviewing the internal CMG-YouTube communications produced in discovery on or about March 1, 2023, and first learned of the mechanism of ongoing cross-distributor exclusion through the Venice disclosure in July-August 2023.

## I. Ongoing Exclusion and Continuing Exclusionary Conduct

48. The harm to Plaintiff did not end with CMG's 2021 termination. Upon information and belief, YouTube continues to maintain backend enforcement flags, restrictions, and related internal designations affecting Plaintiff's catalog, including "invalid reference," "potential violation," and similar designations. These restrictions continue to impair Plaintiff's ability to monetize its catalog through authorized distributors and to participate in YouTube's automated monetization ecosystem.

49. These flags cause Plaintiff's references to be treated as ineligible for monetization, discourage distributors from reinstating or carrying Plaintiff's catalog, and result in the removal or deactivation of Plaintiff's reference files across multiple distributors. As a direct and ongoing

result, Plaintiff's monetization revenue has been reduced to near-zero levels, and Plaintiff continues to suffer new financial injury on a daily basis.

50. Upon information and belief, YouTube's continued application of these unpublished enforcement flags functions as a covert, platform-wide mechanism targeting Plaintiff's catalog and similarly situated independent rights holders. By maintaining non-public designations that identify Plaintiff's catalog as associated with suspected policy violations, and by leveraging YouTube's control over CMS access, claim-processing privileges, and platform standing, YouTube pressures authorized distributors not to upload, reinstate, or continue monetizing Plaintiff's reference files. Because distributors depend on those privileges to manage and monetize catalogs through YouTube's systems at scale, YouTube's conduct functionally forecloses Plaintiff from obtaining stable distributor-based monetization of its catalog despite Plaintiff's undisputed copyright ownership. No neutral procedure exists to challenge or remove these designations. These restrictions also function through the distributor intermediation layer by requiring Plaintiff to access automated monetization through authorized distributors while simultaneously deterring those distributors from reinstating or carrying Plaintiff's catalog through threatened enforcement consequences, and each application or maintenance of those restrictions continues to suppress monetization and foreclose Plaintiff's market participation.

51. Plaintiff also repeatedly attempted to communicate with the distributors who removed its catalog. Beginning in July 2021, Plaintiff demanded that RouteNote identify the specific policy violation and provide proof of YouTube's involvement. RouteNote did not respond substantively, referenced an "investigation" that was never concluded, and promised to provide additional details that were never provided. On August 23, 2021, Plaintiff's counsel contacted RouteNote demanding

resolution. RouteNote did not respond. On August 16, 2023, Plaintiff again contacted RouteNote demanding resolution after two years of silence, and RouteNote refused to reinstate Plaintiff's music (Exhibit F). Upon information and belief, distributors were unable or unwilling to engage with Plaintiff due to YouTube's non-public enforcement designations and the threatened platform consequences associated with carrying flagged catalogs.

**J. Policy Mismatch**

52. YouTube's published examples of "circumventing" the automated monetization system concern channel-based abuse. Plaintiff did not operate or control the third-party YouTube channels through which Plaintiff's music was monetized, and did not create or control the non-music content of the videos in which Plaintiff's music appeared. Plaintiff participated in YouTube's monetization ecosystem as a rights holder whose original music catalog was delivered to YouTube's Content ID system through authorized distributors. Plaintiff monetized only through automated fingerprint-based claims on sound recordings it 100% owned, detected in long-form videos independently uploaded by unaffiliated third-party creators who chose to use Plaintiff's music. The stated "circumvention" rationale, as applied to Plaintiff, did not match the published scope of the policy, which addresses channel-based uploading behavior rather than independent music catalogs supplied for creator use.

52a. To the extent any videos incorporating Plaintiff's music contained content that YouTube deemed ineligible for monetization, that conduct would be attributable to the channel operators who uploaded those videos, not to Plaintiff as a rights holder. YouTube maintains systems designed to identify and address channel-level violations, including demonetization, content removal, and channel strikes. Plaintiff had no ability to control, screen, or approve the non-music content of videos uploaded by independent third-party creators. Plaintiff's recordings were

detected through YouTube's Content ID system using automated audio fingerprint matching. Plaintiff earned revenue only for the portion of each video containing its copyrighted sound recordings, as detected and allocated by YouTube's own automated Content ID system.

53. To the extent the stated enforcement rationale was based on the premise that Plaintiff's music, when detected alongside other rights holders' content within the same video, reduced the proportional revenue allocation to those other rights holders, that premise describes the ordinary operation of YouTube's automated monetization system rather than any circumvention of it. YouTube's Content ID system is designed to detect multiple copyrighted works within a single video and allocate revenue proportionally among all detected rights holders. A rights holder whose legitimately owned music is detected within a video receives its proportional allocation through that automated process.

54. Plaintiff did not claim ownership of any videos. Plaintiff's monetization claims were limited to Plaintiff's copyrighted sound recordings embedded within independently uploaded third-party videos, and revenue was allocated solely for the portion of each video containing Plaintiff's music through YouTube's automated revenue allocation system.

55. Plaintiff owned 100% of the copyrights in its original sound recordings and underlying musical compositions and held the exclusive rights required to monetize those works through the content ID system. No entity has ever disputed Plaintiff's ownership of its catalog, and YouTube has never alleged that Plaintiff lacked the rights required to monetize its works through the Content ID system.

55a. To the extent Defendants rely on a publicly available enforcement policy prohibiting the use of Content ID "to improperly monetize content that is ineligible for monetization on YouTube," Plaintiff's conduct does not fall within the scope of that policy. Plaintiff's sound

recordings were not "ineligible" content. Plaintiff owned 100% of the copyrights in those recordings, delivered them to YouTube's Content ID system through authorized distributors, and monetized through automated fingerprint-based claims when YouTube's system detected Plaintiff's music in videos uploaded by third-party creators. YouTube paid Plaintiff over $600,000 through this automated process before abruptly designating the same content as associated with policy violations. To the extent any videos incorporating Plaintiff's music contained content that YouTube deemed ineligible for other reasons, that conduct is attributable to the third-party channel operators who uploaded those videos, not to Plaintiff as a rights holder who did not control, create, or upload the non-music content of those videos.

## THE RELEVANT MARKET

### A. Market Definition

56. The relevant product market is the market for large-scale automated monetization services for copyrighted sound recordings owned or controlled by participating rights holders, embedded in long-form videos uploaded to online video platforms by independent creators or other third-party uploaders through platform-integrated detection systems. These systems (a) detect those sound recordings embedded within videos uploaded to the platform, (b) allocate advertising and subscription revenue to participating rights holders based on system-detected usage, including when multiple rights holders' works are detected within the same video, and (c) permit monetization without individualized video-by-video licensing negotiations or direct contractual relationships between rights holders and the creators or uploaders of those videos. These systems enable rights holders to monetize their sound recordings at scale without negotiating individual licenses or agreements with each uploader. This market operates as a two-sided platform between

(1) rights holders who supply music catalogs for automated detection and monetization and (2) independent video creators or other third-party uploaders who upload long-form videos incorporating those sound recordings. Strong cross-side network effects exist: more participating rights holders increase the value of the platform to creators and uploaders, while more video uploads increase the advertising and subscription revenue pool available to rights holders. The relevant market is defined by the economic function of large-scale automated monetization of copyrighted sound recordings embedded in long-form videos uploaded to online video platforms rather than by any particular brand or proprietary technology. The fact that YouTube's Content ID infrastructure is presently the only commercially viable participant in this market reflects YouTube's monopoly power rather than any defect in the market definition. No other platform provides a functionally comparable automated system capable of detecting copyrighted sound recordings across billions of videos uploaded to online video platforms and allocating monetization revenue at comparable scale.

57. Rights holders participating on this side of the market compete directly for inclusion in Defendants' automated monetization ecosystem, for detection and monetization of their copyrighted works embedded in user-generated videos, for proportional allocation of advertising and subscription revenue from the same monetization pool, and for creator adoption and use of their music in long-form video content. Plaintiff participated in that competition as an independent rights holder whose 100%-owned catalog was delivered to YouTube's Content ID system through authorized distributors for automated detection and monetization. Independent rights holders such as Plaintiff participate in this market by making their copyrighted sound recordings available through authorized distributors for automated detection and monetization, thereby competing with

other rights holders for creator adoption, monetization share, and participation in the platform's automated revenue allocation system.

**B. YouTube's Dominance in the Relevant Market**

58. Because Defendants' platform-integrated detection and monetization infrastructure (commonly known as Content ID) operates as the primary infrastructure through which rights holders monetize copyrighted sound recordings embedded in long-form user-generated video, exclusion from that system effectively prevents independent rights holders from competing at scale. As a result, exclusion from Defendants' monetization infrastructure prevents independent rights holders from participating meaningfully in the market for monetization of copyrighted sound recordings embedded in long-form user-generated video. From the perspective of independent rights holders such as Plaintiff, no practical substitutes exist at comparable scale. Rights holders cannot replicate this monetization function through direct licensing, manual copyright enforcement, or alternative platforms because those alternatives lack the automated detection, scale of user-generated video, and integrated advertising monetization necessary to generate comparable revenue. In economic reality, Defendants' platform-integrated detection and monetization infrastructure functions not only as a copyright detection tool but also as a monetization and revenue allocation system through which advertising and subscription revenue generated from user-generated videos is distributed among participating rights holders.

59. Defendants control, as a practical economic matter, the overwhelming majority of long-form user-generated audiovisual content consumption in the United States. YouTube's platform hosts the largest repository of user-generated video content globally, with over 2.7 billion active users. YouTube's advertising revenue alone exceeded $36 billion in 2024. Through its automated monetization system, YouTube has paid out over $12 billion to rights holders cumulatively

through December 2024, including approximately $3 billion in 2024 alone. YouTube processes over 2.2 billion automated Content ID claims annually, and in 2024 rights-holders chose to monetize more than 90% of those claims rather than block the content. No other platform approaches this scale.

60. YouTube's long-form video ecosystem supports multiple advertising formats, including pre-roll, mid-roll, and post-roll advertisements, generating sustained monetization windows that materially exceed the monetization potential of short-form content on competing platforms. A ten-minute YouTube video may support multiple ad insertions, while a 15–60 second video on a short-form platform supports at most one. The revenue pool available for proportional allocation among detected rights holders is therefore substantially larger on YouTube than on any alternative platform. In addition to advertising revenue, YouTube also generates subscription revenue through services such as YouTube Premium, through which users pay a monthly fee to watch videos without advertisements, and a portion of that subscription revenue is likewise distributed to participating rights holders through the same Content ID monetization system based on detected usage and viewership.

61. YouTube's dominance is reinforced by powerful cross-side network effects. The larger the base of creators uploading content, the greater the viewership attracted to the platform. The greater the viewership, the larger the advertising revenue pool. The larger the advertising revenue pool, the greater the monetization returns available to rights holders. These reinforcing dynamics make the platform indispensable for rights holders seeking to monetize at scale and create substantial barriers to entry for potential competitors.

**C. Absence of Reasonable Substitutes**

62. From the perspective of independent rights holders seeking to monetize copyrighted music embedded within long-form third-party uploaded audiovisual content at scale, no economically viable substitute exists outside of Defendants' platform and monetization system.

63. TikTok is not a reasonable substitute. During the relevant period (2020–2021) and continuing today, TikTok's core product experience is optimized for short-form viewing and rapid feed consumption, even though TikTok later expanded maximum upload length beyond one minute. TikTok's principal monetization programs are creator-focused eligibility programs—such as TikTok Pulse and Creator Rewards/Creativity—rather than an open, platform-integrated rights-holder claiming system that allocates advertising and subscription revenue to sound-recording rightsholders when their recordings are detected inside long-form uploaded videos. TikTok's music model operates primarily through licensing and royalty arrangements, including pre-cleared music libraries and artist-distribution tools, rather than Content-ID-style monetization claims on long-form uploaded videos. Consistent with that structure, major rightsholders have publicly characterized TikTok music revenue as comparatively small, while YouTube's user-generated-content monetization has been reported as materially larger. TikTok therefore does not provide a functionally interchangeable or economically comparable substitute for the automated monetization ecosystem alleged here.

64. Meta's platforms (Facebook and Instagram) are not reasonable substitutes. Meta provides Rights Manager, a matching tool through which eligible rights holders may upload reference files and take actions that can include claiming ad earnings. However, Meta's music monetization pathway for uploaded videos has been narrower and more constrained than YouTube's. Meta did not announce "Music Revenue Sharing" until 2022—after Plaintiff's exclusion—and Meta's own announcement stated that creators could monetize certain videos with

licensed music, which they previously could not. Meta also imposed significant eligibility and format limitations, including that eligible videos must be at least 60 seconds long, include a visual component, and cannot have licensed music as the video's primary purpose; Meta further stated that creators receive only a minority share of in-stream ad revenue on eligible videos. These constraints, combined with the absence of a YouTube-scale, long-form-centered automated rights-holder monetization ecosystem and the lack of a comparable subscription-supported revenue stream, make Meta's platforms economically and functionally non-interchangeable substitutes for the relevant market defined here.

65. Music streaming platforms (e.g., Spotify, Apple Music, and YouTube Music) are not reasonable substitutes. These services monetize sound recordings through interactive, on-demand audio streaming in which the user listens to the track itself as the primary content. They do not monetize sound recordings as embedded components of long-form uploaded videos through platform-integrated matching and automated allocation of video advertising and subscription revenue. As a result, from the perspective of independent rights holders seeking monetization of sound recordings embedded in long-form uploaded video, streaming royalties are not a functionally interchangeable substitute revenue stream. The two revenue streams serve fundamentally different economic functions.

66. Because TikTok, Meta, and music streaming services do not provide functionally interchangeable, economically comparable alternatives for automated monetization of copyrighted sound recordings embedded in long-form uploaded video at scale, there is low cross-elasticity of demand between Defendants' automated monetization ecosystem and these alternatives. Rights holders participating in Defendants' automated monetization ecosystem do not migrate in meaningful numbers to these alternatives when monetization terms tighten or access conditions

change, because no alternative offers a comparable combination of automated detection, rights-holder monetization, long-form video advertising inventory, subscription-supported revenue, and platform scale. Accordingly, the relevant product market is properly defined as alleged.

### D. Barriers to Entry

67. Entry into the relevant market is foreclosed by substantial barriers, including:

(a) the massive technical infrastructure required to perform automated audio fingerprinting and matching across an enormous volume of uploaded videos, together with large-scale reference-file databases and historical match data;

(b) Defendants' control over the platform-integrated monetization infrastructure necessary to participate in the market, including monetization interfaces, advertising inventory, subscription-supported revenue streams, and revenue-allocation systems;

(c) entrenched network effects among creators, viewers, advertisers, distributors, and rights holders, each of which reinforces the others and increases the value of the platform as participation grows on both sides;

(d) high switching costs for creators and uploaders, including established audiences, subscriber bases, channel history, and accumulated engagement signals, as well as for rights holders, including catalog integration, distributor relationships, historical claim data, and revenue history; and

(e) distributor dependency on Defendants' CMS access, claim-processing privileges, and enforcement determinations, which create an intermediation chokepoint that potential entrants cannot realistically replicate and that Defendants can use through

discretionary or non-transparent enforcement measures to suppress market participation.

## E. Geographic Market

68. The relevant geographic market is the United States. Defendants' automated enforcement, monetization controls, distributor access, and revenue allocation decisions are centrally administered from the United States through U.S.-based personnel, systems, and contractual controls. Competitive conditions within the United States are sufficiently uniform to constitute a distinct geographic market.

## F. Monopoly Power

69. Defendants possess and maintain monopoly power in the relevant market. Defendants control the overwhelming majority of commercially viable automated monetization of copyrighted sound recordings and musical works in long-form user-generated video content in the United States. No competing platform offers a functionally interchangeable system at comparable scale. Defendants possess the ability to exclude competitors and independent rights holders—as they did with Plaintiff—without losing meaningful participation from users, creators, advertisers, or other rights holders.

70. Defendants' exclusion of Plaintiff is representative of a broader pattern of conduct affecting independent music rights holders, including independent labels, artists, and catalog owners. The internal communications between YouTube and CMG confirm that YouTube's enforcement campaign targeted multiple artists and assets beyond Plaintiff, including through "strong purge" directives referencing multiple artists and expanded lists of specific artists and assets to be deactivated transmitted by YouTube's Trust & Safety personnel in April 2021. (Exhibit I). By selectively restricting or terminating the participation of smaller independent catalogs while

maintaining relationships with dominant incumbent rights holders, Defendants reduce competition among music suppliers within the automated monetization ecosystem. This conduct narrows the range of independent catalogs able to compete for creator adoption, use, and monetization within Defendants' automated monetization ecosystem, reduces competitive pressure on incumbent rights holders, and strengthens Defendants' control over the distribution and monetization of copyrighted sound recordings embedded in user-generated video. The suppression of independent catalogs therefore harms competition in the relevant market, not merely Plaintiff individually.

## CAUSES OF ACTION

### AS FOR THE FIRST CAUSE OF ACTION
### Tortious Interference with Contract (New York Law)

71. Plaintiff realleges and incorporates by reference paragraphs 1 through 70 as if fully set forth herein.

72. Plaintiff had a valid, enforceable Distribution Agreement with CMG, dated August 5, 2020. (Exhibit B). The Agreement granted CMG the exclusive right to distribute, monetize, and administer Content ID/Content Claiming for Plaintiff's catalog, with Plaintiff entitled to an 85% net revenue share. The Agreement had an initial one-year term with automatic annual renewals.

73. Defendants knew of this Agreement through their direct dealings with CMG regarding SocialRyse's catalog. The Exhibit I communications demonstrate that Defendants employees, including Ian Connelly, discussed SocialRyse by name with CMG personnel and were aware that SocialRyse's catalog was being monetized through CMG's CMS. (Exhibit I).

74. Defendants intentionally procured CMG's breach of this Agreement by using wrongful means, including coercive threats of severe consequences directed at CMG. Specifically, Defendants threatened to "redact some features or put all claims to pending" if CMG did not

comply with the "strong purge" directive, and warned that "the hammer falls on Create" for non-compliance. (Exhibit I). These threats constituted extreme and unfair economic pressure because Defendants threatened to redact CMG's platform features, place claims into pending status, and subject CMG to further escalation unless CMG removed artists and assets identified by YouTube, thereby jeopardizing CMG's ability to administer and monetize Content ID claims across its client base, not merely its relationship with SocialRyse. YouTube knew that compliance with these directives would necessarily require CMG to terminate its contractual relationship with Plaintiff and cease monetizing Plaintiff's catalog, and YouTube issued these directives with the purpose and intent of bringing about that result.

75. CMG's termination of SocialRyse's monetization constituted a breach of the Agreement. The Agreement permitted CMG to terminate immediately only upon one of four enumerated grounds (material breach, assignment for benefit of creditors, bankruptcy, or appointment of trustee/receiver). (Exhibit B, § 7). None of those grounds existed. SocialRyse had not committed any material breach; it owned 100% of the sound recordings and compositions in its catalog and had operated consistently within the monetization framework previously reviewed and approved by YouTube through AdRev. CMG did not provide the required thirty-day written cure notice before declaring a default. (Exhibit B, § 13(j)). CMG's stated basis for termination—YouTube's "circumvention" concerns—was not an enumerated termination ground under the Agreement. CMG ceased issuing royalty payments and accounting statements to Plaintiff under the agreement after January 2021 (for December earnings), removed all reference files from its CMS, revoked Plaintiff's access to its distributor portal, and prevented any new claims or uploads, all in violation of the Agreement's automatic renewal, monthly accounting, and Content ID monetization obligations (Exhibit B, §§ 1, 5(vi), 6).

76. Defendants intentionally procured CMG's breach of the Agreement by exerting pressure and issuing coercive directives that caused CMG to terminate Plaintiff's participation in the Content ID monetization system despite the absence of any contractual grounds for termination and without providing the notice and cure opportunity required by the Agreement. In the alternative, even if CMG possessed contractual discretion to terminate the relationship, Defendants' conduct remains actionable because it was accomplished through wrongful means, including misrepresentation and deception regarding Defendants' role in the enforcement action, economic coercion exerted through Defendants' control over the automated monetization system, the maintenance of undisclosed enforcement flags and related enforcement designations that caused Plaintiff's references to be treated as ineligible for monetization and, together with distributor-facing pressure and threatened platform consequences, caused authorized distributors to refuse, terminate, deactivate, or decline to reinstate Plaintiff's catalog, and the use of undisclosed, retroactively applied enforcement rationales not previously communicated to Plaintiff as a basis for catalog-wide exclusion.

77. But for Defendants' coercion and behind-the-scenes pressure, CMG would have continued performing under the automatically renewing Agreement. CMG's own internal communications reflect that it viewed SocialRyse as a legitimate label with "a formal licensing website" and that it had "given them the benefit" before YouTube's escalating demands compelled termination. (Exhibit I). The termination was economically irrational for CMG absent external pressure—SocialRyse's catalog was generating rapidly accelerating revenue.

78. As a direct and proximate result, SocialRyse has been damaged in an amount to be proven at trial, but not less than $75,000, including lost past and future royalties.

**AS FOR THE SECOND CAUSE OF ACTION**
**Tortious Interference with Prospective Economic Advantage (New York Law)**

79. Plaintiff realleges and incorporates by reference paragraphs 1 through 78 as if fully set forth herein.

80. Plaintiff had a reasonable expectancy of future economic benefits, including: (a) the continued monetization and automatic renewal under its existing CMG distribution Agreement; (b) expanding exploitation of its rapidly growing music catalog through that agreement; and (c) the ability to enter into distribution relationships with additional distributors. This expectancy was grounded in proven, accelerating revenue growth that YouTube itself had previously approved and facilitated.

81. Defendants interfered with these prospective relationships by wrongful means, including: (a) the fraudulent concealment of Defendants' role in the terminations; (b) coercive threats directed at CMG under threat of CMS feature suppression, constituting extreme and unfair economic pressure; and (c) the continued application of covert enforcement designations and distributor-facing pressure that deter authorized distributors from establishing, maintaining, or reinstating distribution relationships with Plaintiff.

82. Defendants' interference directly destroyed SocialRyse's business and caused substantial damages well in excess of $75,000.

## AS FOR THE THIRD CAUSE OF ACTION
### Monopolization (Sherman Act § 2, 15 U.S.C. § 2)

83. Plaintiff realleges and incorporates by reference paragraphs 1 through 82 as if fully set forth herein.

84. The relevant product market and geographic market are as defined above.

85. Defendants possess and maintain monopoly power in the relevant market, as alleged above.

86. Defendants willfully maintained their monopoly power through exclusionary conduct, including:

    (a) Targeted exclusion of independent rights holders, including Plaintiff, from automated monetization access through coercive distributor pressure and economic leverage over Defendants' Content ID and CMS infrastructure;

    (b) Retroactive application of a previously unpublished enforcement rationale to remove Plaintiff and similarly situated independent rights holders from competitive participation after Plaintiff had already achieved rapid market traction had already achieved rapid market traction, generated over $600,000 in automated monetization revenue through Defendants' own system, and after YouTube itself had previously reviewed and permitted Plaintiff's business model to continue monetizing (Exhibit A);

    (c) Coercion of third-party distributors under threat of punitive CMS feature restrictions and claim suppression (Exhibit I);

    (d) Issuance of purge directives and enforcement pressure compelling distributor compliance under threat of commercial retaliation (Exhibit I);

    (e) Maintenance of covert, non-public "invalid reference" and related backend enforcement flags, together with distributor-facing pressure and threats, that function as a de facto blacklist by causing authorized distributors to refuse, terminate, or decline to reinstate Plaintiff and similarly situated rights holders.

    (f) Affirmative misrepresentations to Plaintiff designed to conceal Defendants' orchestrating role and delay discovery of Plaintiff's claims (Exhibit H).

87. Content ID functions not only as a copyright-detection tool but also as an automated monetization and revenue-allocation infrastructure through which advertising and subscription revenue—including YouTube Premium subscription revenue—is distributed among participating rights holders based on detected usage within videos. According to Google's YouTube Transparency Report, more than 7,700 partners had access to Content ID as of December 2024; claims from Content ID partners represented over 99% of all copyright actions on YouTube, totaling more than one billion claims in 2024; and rights holders chose to monetize more than 90% of those claims rather than block content. In economic reality, Content ID thus operates as the marketplace infrastructure through which rights holders participate in the monetization of copyrighted sound recordings embedded in user-generated video, and exclusion from that system constitutes exclusion from meaningful participation in that marketplace.

88. Because Defendants control the dominant infrastructure through which rights holders monetize copyrighted sound recordings embedded in long-form user-generated video, exclusion from that infrastructure prevents independent rights holders from competing at scale. Independent rights holders cannot realistically replicate or substitute this infrastructure because comparable automated monetization and revenue-allocation systems operating at similar scale do not exist. Because Defendants control the rules governing participation in the Content ID monetization system and the distributor access privileges required to participate, their enforcement decisions effectively determine which rights holders may compete in the market.

89. Upon information and belief, Defendants selectively apply enforcement measures in a manner that disproportionately affects independent rights holders while permitting larger rights holders to continue monetization activities under substantially similar circumstances. Upon information and belief, Defendants maintain internal enforcement flags and monitoring systems

that subject certain catalogs to heightened scrutiny as monetization increases. Upon information and belief, Defendants have not applied, and do not apply, the same "circumvention," "ineligible monetization," or comparable catalog-wide exclusionary enforcement rationales to major-label and other commercially significant rights holders engaged in materially similar rights-holder monetization activity. Plaintiff's belief is based on the continued, uninterrupted participation of major-label and other commercially significant audiovisual rights-holder catalogs in Content ID monetization and on the absence of any publicly reported instance of catalog-wide deactivation or comparable exclusionary enforcement action imposed on any major participant in the Content ID system. These catalogs remain visibly active on the platform and continue to generate monetization revenue through the same automated detection, claiming, and revenue-allocation system from which Plaintiff has been excluded.

90. Defendants have never identified any published Content ID rule applicable to rights holders that Plaintiff violated. Instead, Defendants imposed undisclosed enforcement flags, distributor-facing restrictions, and coercive pressure that caused authorized distributors to refuse, terminate, or decline to monetize Plaintiff's works, while continuing to permit substantially similar monetization practices by larger rights holders within the same system.

91. Upon information and belief, Defendants have continued to apply the same unpublished, non-transparent, or selectively enforced "circumvention" rationale against independent labels, artists, and rights holders beyond Plaintiff, including through catalog-level deactivations, backend ineligibility flags, distributor pressure, and barriers to reinstatement, while not imposing comparable catalog-wide suppression on larger or commercially significant incumbent rights holders engaged in materially similar rights-holder monetization activity.

92. By excluding independent rights holders from automated monetization, Defendants narrow the range of independent catalogs able to compete for creator adoption, use, and monetization within Defendants' automated monetization ecosystem, reinforcing dependence on incumbent rights holders and further entrenching Defendants' platform dominance through cross-side network effects. Defendants' exclusion of independent rights holders served to maintain Defendants' monopoly power by shielding dominant incumbent rights holders from competition by smaller independent catalogs that would otherwise compete for creator adoption and monetization within the same ecosystem.

93. By excluding Plaintiff and similarly situated independent rights holders from participation on the rights-holder side of this market while preserving access for larger incumbent participants, Defendants reduced competitive pressure within the monetization ecosystem and preserved the concentration of monetizable inventory, creator activity, and revenue allocation within Defendants' controlled infrastructure. This selective exclusion foreclosed independent catalog participation and reinforced dependence on Defendants' platform-integrated monetization system.

94. Barriers to entry include the scale of video content required to sustain monetization, the technical infrastructure necessary to perform automated fingerprint detection across billions of videos, and the advertising relationships required to fund revenue allocation. The scale of Defendants' platform, the volume of user-generated content processed through the Content ID system, and the integration of monetization with Defendants' advertising infrastructure create substantial economic barriers preventing new entrants from replicating or competing with Defendants' automated monetization ecosystem.

95. Defendants' exclusionary conduct was motivated by pressure from commercially significant audiovisual rights holders who objected to the proportional allocation of monetization revenue to independent music rights holders within the automated monetization ecosystem. Upon information and belief, Defendants aligned their enforcement actions with these expressed concerns by targeting Plaintiff and similarly situated independent rights holders for exclusion. (Exhibit J, referencing "3rd party rights holders, who have begun their own investigations").

96. Plaintiff's business model introduced an independent music catalog designed for use by video creators within Defendants' automated monetization ecosystem. By promoting original music optimized for creator use and encouraging creators to incorporate those works into their videos, Plaintiff competed for monetization opportunities within the platform's automated detection and revenue allocation system. Defendants' exclusion of Plaintiff removed that competing independent music catalog from the ecosystem and reinforced the position of incumbent rights holders.

97. Defendants' exclusionary conduct harmed competition, not merely Plaintiff, by reducing competition on the rights-holder side of the relevant market, narrowing the range of catalogs able to compete for creator adoption, use, and monetization within the ecosystem, foreclosing rival catalog participation, and concentrating monetization opportunities in favor of larger incumbent participants, as follows:

(a) Suppressing independent rights-holder participation in the automated monetization ecosystem;

(b) Eliminating a competing independent music catalog and monetization option within the ecosystem;

(c) Concentrating revenue-allocation opportunities among commercially significant audiovisual rights holders;

(d) Reducing the range of independent catalogs able to compete for creator adoption and monetization within the monetization ecosystem;

(e) Entrenching Defendants' platform dominance through the reinforcement of cross-side network effects that favor established incumbents;

(f) Structurally foreclosing independent rights holders from the distributor intermediation layer by conditioning distributor access to claim-processing privileges, platform features, and status based platform benefits on compliance with Defendants' exclusionary directives.

98. Defendants' selective exclusion of independent rights holders reduces the number and scale of independent catalogs able to participate in the automated monetization ecosystem, narrows the range of independent catalogs able to compete for creator adoption, use, and monetization, and concentrates monetizable inventory and revenue-allocation opportunities in favor of dominant incumbent rights holders. By restricting independent participation while preserving access for incumbents, Defendants harm competition in the relevant market and reinforce dependence on Defendants' controlled monetization infrastructure.

99. Defendants' actions departed from any legitimate, neutral, or consistently applied enforcement standards. Plaintiff owned 100% of the copyrighted sound recordings and musical compositions it monetized. Plaintiff's revenue was generated solely through the automated detection and revenue-allocation system based on detected usage of Plaintiff's music in independently uploaded videos. YouTube had previously reviewed and approved Plaintiff's monetization model. Defendants' objections were not to the operation of a neutral detected-usage

allocation methodology itself, because the same monetization structure remained available to larger or commercially significant incumbent rights holders; rather, Defendants selectively imposed non-public restrictions and enforcement flags against Plaintiff and similarly situated independent rights holders, while permitting larger rights holders to continue participating in the same system.

100. Defendants' misconduct severed Plaintiff from the sole economically viable monetization channel for its catalog, destroying current income, future market participation, goodwill, and growth trajectory.

101. Defendants' conduct harms competition in the relevant market by excluding independent rights holders and reducing the number of catalogs able to participate in large-scale automated monetization of copyrighted sound recordings embedded in long-form user-generated video. By restricting independent catalogs through unpublished enforcement designations, backend flags, and distributor-facing pressure while allowing major-label and other commercially significant rights holders to continue participating, Defendants foreclose independent rights holders from competing on equal terms within the monetization ecosystem and reduce creator and audience access to competing music catalogs.

102. In the alternative, Defendants engaged in attempted monopolization through specific intent to exclude independent competitors, predatory exclusionary conduct, and a dangerous probability of achieving monopoly power, which Defendants in fact already possess.

103. As a direct and proximate result of Defendants' exclusionary conduct, Plaintiff has suffered and continues to suffer injury to its business and property, including destruction of revenue streams, loss of future profits, loss of goodwill, and permanent impairment of market access. Plaintiff's antitrust damages are substantial and exceed $75,000.

104. Defendants' continued maintenance of enforcement flags, internal restrictions, and policy classifications that cause Plaintiff's references to be treated as ineligible for monetization and, together with distributor-facing restrictions and threatened platform consequences, cause authorized distributors to refuse, terminate, deactivate, or decline to reinstate Plaintiff's catalog for automated monetization through the Content ID system constitutes ongoing exclusionary conduct that cannot be fully remedied by monetary damages alone and causes irreparable harm. Plaintiff therefore seeks injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, including an order requiring Defendants to remove all enforcement flags and backend restrictions applied to Plaintiff's catalog and to restore Plaintiff's full access to the automated monetization ecosystem. Plaintiff further seeks a declaratory judgment that Defendants' enforcement actions, ongoing backend flags, and exclusion of Plaintiff from the automated monetization ecosystem violate Section 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiff also seeks damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

## AS FOR THE FOURTH CAUSE OF ACTION
### Common Law Unfair Competition (New York)

105. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

106. Defendants engaged in unfair competition under New York common law by acting in bad faith to coerce distributors, misrepresent their involvement, selectively enforce unpublished policies against independent rights holders, and maintain undisclosed enforcement flags that suppressed Plaintiff's catalog. Through that conduct, Defendants misappropriated the commercial value of Plaintiff's creator relationships, goodwill, and monetization opportunities, and appropriated those benefits to preserve and reinforce Defendants' incumbent-favored monetization

ecosystem. This conduct caused Plaintiff substantial injury and continues to do so. Plaintiff is entitled to injunctive relief, declaratory relief, and damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

(a) Compensatory damages in an amount to be proven at trial, but not less than $75,000, for all lost revenue, profits, and other harms, including expectancy damages based on the automatic annual renewal structure of the CMG Agreement and Plaintiff's demonstrated revenue trajectory prior to YouTube's interference;

(b) Treble damages, costs, and attorneys' fees to the extent authorized by Section 4 of the Clayton Act, 15 U.S.C. § 15, and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26;

(c) A permanent injunction ordering Defendants to:

(i) Remove all "invalid reference," "potential violation," and related enforcement flags currently applied to Plaintiff's catalog in Defendants' systems;

(ii) Process Plaintiff's catalog through the Content ID system on the same terms and conditions as other rights holders with undisputed copyright ownership who submit reference files through authorized distributors, without enforcement flags, claim-routing restrictions, revenue suppression, distributor-facing pressure, or other limitations arising from the enforcement actions challenged herein;

(iii) Cease any further interference with Plaintiff's participation in the automated monetization ecosystem, including by refraining from imposing discriminatory, non-transparent, or retaliatory restrictions that suppress monetization of Plaintiff's catalog through the Content ID system, and from applying the "circumventing Content ID"

rationale, or any substantially similar enforcement designation, to Plaintiff's catalog based on the uploading conduct of third-party channel operators not controlled by Plaintiff;

(iv) Disclose to Plaintiff any internal enforcement flags, restrictions, internal designations, policy classifications, lists, or instructions currently applied to Plaintiff's catalog or identifying SocialRyse, SRMD, Music-4-Videos, or Ralph Cohen that affect monetization eligibility or distributor access; and

(v) Be enjoined from directly or indirectly interfering with Plaintiff's lawful distribution relationships through distributor-facing pressure, coercive communications, retaliatory enforcement actions, or backend restrictions arising from the conduct challenged herein;

(d) Punitive and exemplary damages in connection with Plaintiff's state-law claims, including tortious interference and unfair competition;

(e) A declaratory judgment that Defendants' challenged enforcement actions and exclusion of Plaintiff from the automated monetization ecosystem violate Section 2 of the Sherman Act and constitute tortious interference with contract, tortious interference with prospective economic advantage, and unfair competition under New York law;

(f) Pre- and post-judgment interest at the maximum lawful rate;

(g) Reasonable attorneys' fees and the costs and expenses of this action to the extent permitted by law; and

(h) Such other and further relief as the Court deems just and proper.

### **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 13, 2026
Respectfully submitted,

*/s/ Courtney K. Davy*

**COURTNEY K. DAVY, ESQ.**
Attorney for Plaintiff
299 Broadway, Suite 800
New York, NY 10007
(516) 850-1800