UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

SOCIALRYSE LLC,

                         Plaintiff,            Case No. 1:25-cv-10337-LAK

                -against-

YOUTUBE LLC and GOOGLE LLC,

                        Defendants.

-------------------------------------------------------------------X

### PLAINTIFF'S SUR-REPLY MEMORANDUM IN FURTHER OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

As the Court permitted in its March 17, 2026 Order (ECF No. 23), Plaintiff's Sur-Reply is not limited to particular issues and fully responds to Defendants' expanded 20-page Reply.

### I. PRELIMINARY STATEMENT

Defendants' Reply does three things this Court should not permit. First, it selectively excerpts portions of the record—most notably Exhibit I's investigatory questions—while omitting the escalating directives, threats of platform consequences, and entity-level coercion that followed—asking this Court to resolve a factual dispute at the pleading stage. Second, it raises new arguments—including a forfeiture theory on the Sherman Act § 2 element and a claim that fraudulent concealment and equitable estoppel are "logically inconsistent"—that Plaintiff addresses here for the first time. Third, it characterizes Defendants' role as passive and informational, while the Amended Complaint—and the very exhibits Defendants cite—plausibly allege active direction, coercive escalation, and affirmative concealment of that role from Plaintiff.

At the pleading stage, this Court must accept Plaintiff's well-pleaded allegations as true and draw all reasonable inferences in Plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Reply asks the Court to do the opposite. This invitation should be rejected.

### II. ARGUMENT

1

**A. Plaintiff's Claims Are Timely Under Both Fraudulent Concealment and Equitable Estoppel.**

    **1. Partial Awareness of a General Concern Is Not Discovery of the Concealed Claims Asserted Here.**

Defendants argue throughout their Reply that Plaintiff was on notice of its claims in 2021 based on the allegation of "circumvention." Yet even in their nearly 20-page Reply, Defendants fail to articulate what conduct by a rights holder constitutes "circumvention," how that concept applies to a rights holder who submits its music through authorized distributors for independently uploaded videos, or what specific rule Plaintiff allegedly violated. Absent any such explanation, Defendants cannot credibly contend that Plaintiff was on notice of its claims in 2021. These allegations do not establish inquiry notice as a matter of law. The same lack of clarity that persists today was precisely why Plaintiff reasonably understood the dispute as distributor-related and had no reasonable basis to discover Defendants' role prior to 2023. Defendants still do not identify any specific rule governing rights holders that Plaintiff allegedly violated.

The Reply conflates awareness of a distributor's stated rationale with discovery of the facts constituting Plaintiff's claims. The claims here are not that YouTube communicated a policy concern to CMG, but that Defendants coerced CMG's termination through threats of platform consequences while denying their role, then maintained non-public backend enforcement designations suppressing Plaintiff's catalog across distributors. CMG's form termination email identified no specific violation. Defendants selectively quote Plaintiff's "same story with YouTube." Defendants omit Plaintiff's contemporaneous statement that "We did nothing wrong and this seems like an excuse not to pay us our earnings," which further supports Plaintiff's reasonable belief that the dispute was distributor-related rather than the result of platform-directed enforcement. RouteNote's references to "circumvention" likewise disclosed no rule, conduct, or enforcement mechanism. At the same time, CMG ceased royalty payments, stopped providing accountings, and ignored Plaintiff's follow-up inquiries, reinforcing Plaintiff's reasonable understanding that the dispute was distributor related.

Plaintiff had previously received YouTube's approval for its monetization practices in June 2020, through AdRev. Ex. A; Am. Compl. ¶ 12. In light of that prior approval, the absence of any identified rule violation, and CMG's nonpayment and silence, Plaintiff reasonably understood the dispute to concern distributor-side conduct. Defendants reinforced this understanding, stating that revenue arrangements were "out of our scope," that they "do not mediate between creators and distributors," and that they "did not suspend [Plaintiff's] assets," directing Plaintiff to resolve the matter with CMG. Ex. G; Ex. H; Am. Compl. ¶¶ 32, 36. Consistent with those representations, Plaintiff pursued resolution with its distributor and initiated litigation against CMG—the precise course of action Defendants recommended. Am. Compl. ¶¶ 39, 44.

Defendants' reliance on "Exhibit F" is misplaced. Reply at 8. Exhibit F concerns RouteNote's later refusal to reinstate Plaintiff's catalog, not the February 2021 communications. The February exchange described in the FAC (Ex. G) addressed channel-level revenue arrangements and expressly disclaimed enforcement involvement, and therefore cannot support Defendants' notice argument.

None of these communications disclosed that Defendants were simultaneously issuing purge directives under threat of platform consequences, that YouTube employee Ian Connelly had warned "the hammer falls on Create," or that Defendants had imposed non-public backend enforcement designations preventing any distributor from reinstating Plaintiff's catalog. Am. Compl. ¶¶ 24–25, 42, 47. Plaintiff did not learn of these designations until Venice Music disclosed them in July–August 2023. Am. Compl. ¶ 42; Ex. L.

Defendants contend that the March 2021 termination email gave Plaintiff sufficient notice of its claims. But at that time, CMG had ceased all royalty payments and accountings without identifying any specific rule Plaintiff violated — conduct that reinforced Plaintiff's reasonable belief that the dispute was distributor-driven. When Plaintiff investigated directly, YouTube — the only party with access to its internal enforcement systems — affirmatively represented that the termination was CMG's decision and directed Plaintiff to pursue remedies against CMG. Plaintiff reasonably credited the party with superior knowledge over a distributor with demonstrated

financial motives to deflect blame. A reasonable party, relying on the only entity with direct knowledge of the platform's enforcement mechanisms, would not simultaneously initiate litigation against that entity while it disclaimed responsibility. Plaintiff pursued CMG — the precise course of action Defendants directed — which directly caused the delay Defendants now invoke as a bar. Defendants cannot create the conditions that made their misdirection effective and then fault Plaintiff for believing it.

### 2. Defendants' Representations Were Affirmative Misdirection, Not Mere Denials.

The Reply characterizes YouTube's July 2021 advice to seek counsel as helpful rather than deceptive. Reply at 9. But the concealment lies in the accompanying diagnosis: "it looks like it was Create Music Group who suspended your assets" and "YouTube is not able to suspend your assets." Ex. H; Am. Compl. ¶ 36. At the time, YouTube's own employee had directed a "strong purge," threatened CMS feature suppression, and warned "the hammer falls on Create." Am. Compl. ¶¶ 24–25. The misdirection was in the attribution of cause—and the advice to pursue remedies against CMG rather than YouTube reinforced that false attribution by steering Plaintiff toward the wrong party.

Plaintiff's subsequent efforts confirm reasonable reliance. Following the termination, Plaintiff pursued reinstatement through alternative distributors and resumed monetization through Venice Music before that access was again disrupted by the same non-public enforcement designations Defendants had never disclosed. Am. Compl. ¶ 42. Defendants cannot simultaneously direct Plaintiff toward its distributors while later arguing Plaintiff was on full notice of Defendants' concealed role in 2021.

### 3. Fraudulent Concealment and Equitable Estoppel Are Pled as Alternatives, Not Contradictions.

The Reply argues these theories are "logically inconsistent." Reply at 11. But Federal Rule of Civil Procedure 8(d)(2) expressly permits alternative pleading. Fraudulent concealment applies if the Court finds Plaintiff did not know of its claims against YouTube. Equitable estoppel applies if the Court finds Plaintiff had some awareness but was induced by YouTube's misdirection to

4

pursue CMG instead. *Butala v. Agashiwala* involved plaintiffs who argued both theories were simultaneously operative, not plaintiffs who pled them as alternatives addressed to different factual determinations. At the pleading stage, this distinction is dispositive.

### 4. Involving Prior Counsel Does Not Substitute for Disclosure of Concealed Facts.

The Reply argues that involving counsel in August 2021 "end[ed] equitable tolling." Reply at 7 n.5. But involving counsel in connection with a demand over unpaid distributor royalties does not disclose that YouTube directed a "strong purge," threatened CMS feature suppression, or imposed non-public backend enforcement flags. The relevant inquiry is when Plaintiff could have discovered the facts giving rise to its claims—not when it involved prior counsel regarding a different dispute with a different party.

During the intervening period between August 2021 and August 2023, Plaintiff continued to follow the exact course of action Defendants had directed—pursuing resolution with its distributors and litigating against CMG. Am. Compl. ¶¶ 39, 44. Absent disclosure of the non-public designations and coercive directives, further follow-up with Defendants would have produced only the same deflection Defendants had already supplied. Defendants identify no information available to Plaintiff during the gap period that would have revealed their concealed role, and the absence of any such discoverable facts defeats Defendants' diligence attack. At minimum, the record supports competing inferences that cannot be resolved on a motion to dismiss.

### B. The Amended Complaint States Claims for Tortious Interference with Contract and Prospective Economic Advantage.

### 1. Exhibit I Shows Coercion, Not Collaborative Investigation.

The Reply constructs an alternative reading of Exhibit I in which Google merely flagged suspicious activity, asked CMG to investigate, and deferred to CMG's judgment. Reply at 3–4, 13. That reading is selective. It excerpts the investigatory questions while omitting the escalation that followed when CMG's investigation did not produce the result Defendants wanted. Read in sequence with inferences in Plaintiff's favor, the communications show: Defendants flagged

activity; CMG investigated and identified SocialRyse as legitimate and "given them the benefit." Am. Compl. ¶ 27; Ex. I. Defendants then rejected that assessment, directing a "strong purge," threatening to "redact some features or put all claims to pending," and warning that "the hammer falls on Create." Am. Compl. ¶¶ 24–25. CMG terminated SocialRyse despite its own assessment of legitimacy. Am. Compl. ¶ 77. This sequence—investigate, find legitimate, escalate and override—plausibly supports coercion, not collaboration. Defendants' own words are the very definition of the "extreme and unfair economic pressure" New York courts recognize as actionable interference.

The Reply attempts to narrow these threats to "specific assets." Reply at 16. But "the hammer falls on Create, not these folks" is unambiguously an entity-level threat directed at CMG as an organization. Am. Compl. ¶ 25. The "redact some features" language refers to CMS-level capabilities affecting CMG's entire client base, not individual reference files. These threats to CMG's broader platform operations constitute the kind of "extreme and unfair economic pressure" recognized under New York law. Plaintiff was willing and able to address any legitimate concern, but Defendants never identified any specific violation, provided notice of a defined rule, or offered any opportunity to cure. (FAC ¶¶ 52–55.) Instead, they targeted Plaintiff's entire catalog through distributor coercion and non-public enforcement flags. This disproportionate, asset-level response further demonstrates pretextual exclusion.

**2. The Amended Complaint Adequately Alleges Specific Intent and Knowledge.**

The Reply argues Defendants' conduct was merely "incidental" to lawful enforcement, citing *High Falls Brewing Co.*, 513 F. App'x 12 (2d Cir. 2013). *High Falls* involved a defendant pursuing an independent business objective where interference was a byproduct. Here, the enforcement action was itself the instrument of harm directed at Plaintiff by name. Connelly specifically discussed SocialRyse with CMG, issued escalating directives after CMG found SocialRyse legitimate, and YouTube knew compliance would require termination of Plaintiff's

monetization. Am. Compl. ¶¶ 24–27, 73–74. This is targeted enforcement, not incidental interference.

On contract knowledge, Defendants communicated directly with CMG about Plaintiff's catalog and understood that CMG was contractually authorized to distribute and monetize it through its CMS. Am. Compl. ¶ 73. CMG's termination fell outside every enumerated ground in the Agreement, CMG provided no cure notice, CMG ceased royalty payments, and CMG's suspension was economically irrational absent external pressure given Plaintiff's rapidly accelerating revenue. Am. Compl. ¶¶ 29, 75, 77. Whether Defendants knew the precise text of those provisions is a factual question not appropriate for pleading-stage resolution.

### 3. The Wrongful Means for Prospective Economic Advantage Rest on Coercive Threats and Ongoing Enforcement Flags.

The Reply argues that Google's July 2021 misrepresentations cannot constitute "wrongful means" because they post-dated the interference and were directed at Plaintiff rather than CMG. Reply at 15. To be clear: the primary wrongful means are the coercive threats directed at CMG (Am. Compl. ¶ 81(b)) and the ongoing non-public enforcement designations that deter distributors from reinstating Plaintiff's catalog (Am. Compl. ¶ 81(c)). The July 2021 misrepresentations support the tolling and estoppel theories only. The coercive conduct and enforcement mechanism are the wrongful means—directed at distributors, the relevant third parties, and proximately causing ongoing interference with Plaintiff's prospective business relationships.

No published rule was identified as violated, no compliance pathway was provided, and no opportunity to cure was offered. Am. Compl. ¶¶ 52–55a. A rights holder cannot reasonably be charged with circumventing an unpublished rule or cure a violation Defendants never identified.

### C. The Amended Complaint States a Claim for Common-Law Unfair Competition.

The Reply argues Plaintiff has not alleged what was "misappropriated." Reply at 17. But New York common-law unfair competition encompasses "commercial bad faith" that injures another's commercial advantage. *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 476 (2007); *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34–35 (2d Cir. 1995). The doctrine does not require

direct competition; it reaches bad-faith conduct that exploits or injures another's commercial interests. *ITC Ltd.*, 9 N.Y.3d at 478.

The Amended Complaint plausibly alleges precisely that type of misconduct. It alleges that Defendants engaged in bad-faith coercion of distributors, misrepresentation regarding the source of enforcement actions, selective application of unpublished policies, and the use of undisclosed backend enforcement designations—conduct that eliminated Plaintiff's ability to monetize its catalog and disrupted its creator relationships, goodwill, and revenue streams. Am. Compl. ¶ 106.

This misappropriation is not abstract. It consists of Defendants' control, suppression, and redirection of specific monetizable digital assets associated with Plaintiff's catalog on YouTube's platform, including: (i) revenue streams generated from Content ID claims on videos incorporating Plaintiff's sound recordings; (ii) Plaintiff's Content ID reference files, claiming rights, and associated claim history reflecting established monetization activity; and (iii) the platform-level control and monetization of Plaintiff's recordings within YouTube's Content ID system. These are concrete, revenue-generating assets—not merely generalized business interests—which Defendants allegedly restricted through non-public enforcement flags and coordinated distributor actions.

By depriving Plaintiff of the ability to exploit these assets while maintaining control over their monetization within the platform, Defendants plausibly diverted and reallocated the economic value of Plaintiff's catalog to an incumbent-favored ecosystem. At the pleading stage, these allegations plausibly state a claim for unfair competition under New York law.

**D. The Sherman Act § 2 Claim Is Not Forfeited and States a Plausible Theory of Monopoly Maintenance.**

**1. Plaintiff Did Not Forfeit the Monopoly-Maintenance Theory.**

The Reply argues Plaintiff "forfeited" its Section 2 claim by failing to address whether the challenged conduct contributed to monopolization. Reply at 18. This is incorrect. The Opposition's Section VII.D directly addresses how Defendants' exclusionary conduct harms competition and maintains monopoly power. Opp. at 19–20. The FAC explicitly alleges that "Defendants'

exclusion of independent rights holders served to maintain Defendants' monopoly power by shielding dominant incumbent rights holders from competition." Am. Compl. ¶ 92; see also ¶¶ 93, 97–98. Defendants' recharacterization of this as a distinct, unaddressed element attempts to subdivide a unified theory to manufacture a procedural default. But even if prior briefing were less explicit, Defendants raised forfeiture for the first time in their Reply, and this sur-reply is the proper vehicle to clarify the mechanism.

### 2. Selective, Incumbent-Favoring Enforcement Is a Plausible Mechanism of Monopoly Maintenance.

The Reply argues that Plaintiff's cross-side network effects theory contradicts the monopoly-maintenance theory because excluding independent rights holders would reduce platform value. Reply at 19. This misunderstands the economic mechanism alleged.

Defendants assume that maximizing overall rights-holder participation is always consistent with maintaining monopoly power. It is not. As alleged, Defendants selectively restrict participation by independent rights holders precisely when their growth threatens to disrupt incumbent revenue shares, thereby protecting the dominant incumbents on whom Defendants' platform dominance depends. Am. Compl. ¶¶ 89, 91–93, 95. When an independent catalog like Plaintiff's grows rapidly—from approximately $29,000 to $216,000 in monthly net revenue—it captures a larger proportional share of monetization in videos also containing major-rights-holder content, threatening incumbent revenue shares. Am. Compl. ¶¶ 17–20. CMG's termination email confirms this: "the nature of the activity circumvents Content ID and hinders other 3rd party rights holders, who have begun their own investigations." Ex. J; Am. Compl. ¶ 21.

Critically, the Exhibit I communications reveal that CMG informed YouTube that "all three majors currently do this and pass through portions of revenue." Ex. I; Am. Compl. ¶ 89. YouTube received that statement and continued its relationships with those dominant rights holders while simultaneously directing a "strong purge" affecting independents. This supports a strong inference of selective, asymmetric enforcement: the same practice was tolerated when engaged in by dominant incumbents while independents were targeted through distributor-level pressure. By

9

purging independents while preserving access for incumbents, Defendants protect incumbent revenue shares and preserve the concentration of monetizable inventory, creator activity, and revenue allocation within Defendants' controlled infrastructure—reinforcing dependence on YouTube's platform and sustaining Defendants' monopoly power. Am. Compl. ¶¶ 92–93, 97. The FAC alleges a platform-level enforcement mechanism—implemented through distributors and non-public backend designations—that excludes independent rights holders across distributors, not just Plaintiff. Am. Compl. ¶¶ 42–47. Plaintiff need not prove market-wide effects at the pleading stage; it is enough that the Amended Complaint alleges a logical economic mechanism for willful maintenance of monopoly power through selective exclusion.

### 3. Defendants' Asserted Justification Does Not Defeat Plaintiff's Claim at the Pleading Stage.

The Reply characterizes Defendants' enforcement as routine policy application. Reply at 3–4. But the FAC plausibly alleges that permanent exclusion was neither necessary nor competitively neutral. Defendants could have addressed any purported concerns through neutral, clearly articulated rules applied uniformly. Instead, Defendants left the Content ID system unchanged and selectively removed a rapidly growing independent rights holder while preserving the same framework for dominant incumbents. Am. Compl. ¶¶ 9, 54, 89, 91. Where a platform identifies a purported issue with its own system but responds by excluding a participant rather than modifying the system, that supports a plausible inference of pretext.

Finally, the Reply argues that Plaintiff's monopoly-power allegations lack market-share context. Reply at 20. Where no competitor provides a functionally comparable service (Am. Compl. ¶ 56), YouTube's absolute figures necessarily represent the entire commercially viable market. *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001). On the FAC's allegations, that functional uniqueness is itself what gives YouTube the power to exclude participants from the relevant market through backend designations that distributors cannot override in practice.

### III. CONCLUSION

10

WHEREFORE, Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss in its entirety.

Dated: April 14, 2026
      New York, NY

Respectfully submitted,

/s/ Courtney K. Davy
COURTNEY K. DAVY, ESQ.
Attorney for Plaintiff
299 Broadway, Suite 800
New York, NY 10007
(516) 850-1800
Courtneydavy.esq@gmail.com
cdavy@cdavylaw.com

11